UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| Michael Bagby, | : | Case No. 1:12-CV-488 |
| --- | --- | --- |
| Plaintiff, | : | |
| vs. | : | |
| Covidien, | : | |
| Defendant. | : | |

# ORDER

Before the Court is Defendant's motion to dismiss Counts 3, 4, 5, and 6 of Plaintiff's complaint for failure to state a claim, pursuant to Fed. R. Civ. Proc. 12(b)(6). (Doc. 4) In his response, Plaintiff does not contest the dismissal of Counts 3, 4 and 6, but does oppose dismissal of Count 5, his claim for intentional infliction of emotional distress. (Doc. 7) Defendant has filed a reply. (Doc. 8)

For the following reasons, the Court finds that Defendant's motion is well-taken and it will be granted.

## FACTUAL BACKGROUND

Plaintiff Michael Bagby is a former employee of the Defendant, Tyco Healthcare Group LP d/b/a Covidien (hereinafter referred to as "Covidien"). His complaint alleges that he worked in a sales capacity as a Senior Surgical Device

specialist.  He began work in September 2006, and remained in his position until May 2011, when he alleges that he was "forced to resign due to retaliation and harassment for his disability and perceived disability, and for utilizing leave under the Family Medical Leave Act."  (Doc. 6 at ¶6)

Bagby alleges that sometime in 2009, he inadvertently called ("pocket-dialed" on his cellphone) his direct supervisor, Regional Manager Jeremy Korniak.  Bagby was having a conversation with his parents at the time, and was criticizing Korniak.  The inadvertent phone call was recorded, and Korniak reported it to Covidien Human Resources personnel.  They advised Korniak to give Bagby a verbal counseling, and then close the issue.  According to the complaint, Korniak followed these instructions.

In mid-2010, Bagby was diagnosed with severe anxiety and panic disorder, with major unipolar depression. (Doc. 6 at ¶12)  When Bagby told Korniak about his condition, he alleges that Korniak began treating him in a hostile and intimidating manner.  Bagby began an approved FMLA leave on August 16, 2010, and alleges that he wanted to return to his job in December, but that Covidien prevented him from doing so until February 2011.  Bagby alleges that while he had been promised many coaching, professional development, and "Company exposure" opportunities, he did not receive these opportunities upon his return

from FMLA leave.  (Id. at ¶¶16-17.)  Other employees who were not disabled or perceived to be disabled, did receive these opportunities.  Korniak took one of Bagby's largest sales accounts away from him, depriving him of an opportunity to increase his compensation.  Bagby alleges that the entire sales team had access to a customer information database that had been installed while he was on leave, but he had not been given access to that database.  Instead, he was told to focus on an initiative that formed only a small part of his compensation plan.  When Bagby asked Korniak about professional development opportunities, Korniak responded "Let's just focus on getting you re-acclimated and on the PDP, and worry about that stuff later."  (Id. at ¶22)  Bagby alleges that he never received a PDP (which the Court assumes refers to a performance improvement plan or something similar).

      In addition, Bagby alleges that he was asked to sell products for which he lacked either a product exemplar or sales literature.  As of March 13, 2011, Bagby alleges that he did not have a compensation plan, a sales quota, a business plan or any sales territory data, and that he did not know how to use the computer programs that were implemented while he was on FMLA leave.  He was also told to focus on a new product that was on national backorder; as a result, he had no samples to use in sales presentations, and not all of his accounts were approved to

purchase this new product. He alleges that Korniak did not respond to over half of the emails Bagby sent to him, and that the HR Benefits Manager had not given him a copy of the Short Term Disability Plan he had requested. He was asked to provide his itinerary and daily updates on his activities, while no other member of his sales team was asked for this information. He alleges that this treatment was causing a reoccurrence of his severe anxiety and panic disorder and depression. As a result, Bagby alleges that he was compelled to terminate his employment with Covidien in May 2011.

Bagby filed a charge of disability discrimination and retaliation with the EEOC (Doc. 4, Exhibit B). He then filed a complaint in the state court, alleging six claims for relief. (Doc. 6) Covidien timely removed the case to this Court on the basis of 28 U.S.C. §1331, as Count Two of Bagby's complaint alleges claims under the Family and Medical Leave Act. Covidien answered the complaint with respect to Counts One and Two (disability discrimination and FMLA discrimination and retaliation), and filed a motion to dismiss Counts Three through Six. (Doc. 4) As noted above, the only of these four claims that Bagby seeks to preserve is Count Five, his state law claim for intentional infliction of emotional distress. Covidien argues that the facts Bagby alleges fail to support such a claim as a matter of law; Bagby disagrees.

ANALYSIS

In reviewing a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6), the Court accepts the well-pleaded factual allegations of the complaint. The complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). A claim will survive if the allegations are "... enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Jones v. City of Cincinnati, 521 F.3d 555, 559 (6th Cir. 2008), citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). See also, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), holding that a complaint must allege facts that, if accepted as true, state a plausible claim for relief.

Intentional Infliction of Emotional Distress

The Ohio Supreme Court first recognized the tort of intentional infliction of emotional distress in Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am., 6 Ohio St. 3d 369, 453 N.E.2d 666 (1983). The tort requires a showing of "... extreme and outrageous conduct [that] intentionally or recklessly causes severe emotional distress to another ...". Id. at 374, quoting Restatement of the Law 2d, Torts (1965) 71, Section 46(1). In discussing what sort of conduct constitutes "extreme and outrageous conduct," the

court relied the Restatement's formulation:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. [sic]  There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Yeager, 6 Ohio St. 3d at 374-75, quoting Restatement 2d, §46, comment d.

The elements of a claim for intentional infliction of emotional distress are:

"(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the

defendant's conduct was the proximate cause of plaintiff's serious emotional distress." Phung v. Waste Mgt. Inc., 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1994). As one district court aptly observed, "to say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." Baab v. AMR Services Corp., 811 F. Supp. 1246, 1269 (N.D. Ohio 1993).

Assuming that all of Bagby's factual allegations are true, this Court must conclude that they do not establish the type of extreme and outrageous conduct that could support a claim for intentional infliction of emotional distress. Bagby's allegations of unfair treatment, such as ignoring over half of his emails; assigning him a product to sell without exemplars that he could demonstrate to physicians; failing to give him a copy of a disability plan or a PDP; or reassigning his sales accounts, are not the type of extreme and outrageous conduct that the courts have found can sustain a claim. Case law amply supports this conclusion.

In Wolfe v. Thermo Fisher Scientific, Inc., 2009 U.S. Dist. LEXIS 41702 (S.D. Ohio, May 4, 2009), the plaintiff alleged that she had innocently hugged a female coworker at a company event; immediately afterward, her supervisor and other managers "commented, made fun, ridiculed and made other inappropriate and sexually charged remarks about the hug." Plaintiff was falsely charged with

sexual harassment, news of which spread to other employees and managers, subjecting plaintiff to further ridicule and harassment. A few weeks later, plaintiff was forced to meet with a group of managers and was asked "inappropriate and sexually offensive and intimidating questions about Plaintiff's personal and sexual life outside of work with the purpose, intent and effect of humiliating Plaintiff." Defendants "threatened and intimidated Plaintiff in an attempt to obtain private information about Plaintiff's personal and sexual life outside of work, including threatening to terminate her husband, who was also employed" by the defendant, and they "... falsely imprisoned Plaintiff for four hours without food or water while they interrogated, intimidated, harassed and embarrassed her." Id. at **2-3, 6. She further alleged that she was ultimately terminated due to her complaints about the hostile work environment she had to endure. The district court granted the employer's Rule 12 motion to dismiss her IIED claim, noting that the alleged conduct was "definitely inconsiderate and unkind," and even incorrigible, but did not rise to the level required to establish intentional infliction of emotional distress under Ohio law. Id. at *8. The district court relied on Baab v. AMR Servs., 811 F.Supp. at 1269-70, which concluded that plaintiff's allegations of "... pin-ups of scantily clad celebrities in common areas, the hidden display of pictures of naked women (not engaging in sexual acts) to which plaintiff was exposed by coworkers,

and the receipt of pornographic, explicit photographs and sex toys in her locker," were insufficient to sustain a claim.

In McDaniel v. PNC Bank, 2012 U.S. Dist. LEXIS 13375 (S.D. Ohio, February 3, 2012), plaintiff alleged that a new supervisor treated her and other minority employees differently, segregating them from non-minority employees; that the supervisor disciplined her for an attendance infraction while not disciplining non-minority employees with more serious attendance issues; altered her job duties to make it more difficult for her to meet goals and earn bonuses; verbally counseled her for handling a customer call that she believed she handled correctly; and issued her a written warning in retaliation for her submission of an anonymous suggestion about improving a bank policy. She alleged that she had to take leave due to depression, stress, and anxiety caused by the supervisor, and eventually resigned her position. The district court granted the employer's motion to dismiss plaintiff's IIED claim, because the facts did not establish extreme and outrageous conduct as a matter of law.

See also, Rubin v. Ford Motor Co., 2006 U.S. Dist. LEXIS 51522 (S.D. Ohio, July 27 2006), granting summary judgment to the employer on the plaintiff's IIED claim, which arose from a series of incidents culminating in his termination from employment. Plaintiff alleged that one of his supervisors argued with him

about an incident involving an employee, and "pointed his finger" into plaintiff's chest; he was forced to take medical leave due to anxiety and stress caused by conditions at work; and he was terminated after taking a second medical leave. The court found that this evidence was insufficient, and noting that it is "... well-established under Ohio law that an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more." Id. at *16, citing Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 376 (6th Cir. 1999). If that were not the case, "... every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress." Id.

    And outside of the employment context, in Sinclair v. Donovan, 2011 U.S. Dist. LEXIS 128220 (S.D. Ohio, November 4, 2011), the district court dismissed IIED claims against mortgage servicers who allegedly violated mandatory FHA guidelines with respect to servicing plaintiffs' mortgages. The court held: "[I]mproper servicing of the homeowners' loans, even in violation of mandatory FHA guidelines regarding loss mitigation, is not the set of facts that to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' Even in these difficult financial times, a failure to offer loan mitigation options is not, as a matter of law, conduct 'so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. at *42 (quoting Yeager, 6 Ohio St. 3d at 375).

In contrast, in another case arising from a non-employment situation, the Sixth Circuit vacated the district court's Rule 12 dismissal of plaintiff's IIED claim. In Miller v. Currie, 50 F.3d 373 (6th Cir. 1995), the plaintiff's 98-year old mother was in a nursing home that was owned and operated by one of the defendants. Plaintiff alleged in her complaint that the nursing home operator and two of her relatives (also named as defendants) were all involved in hiding her mother from her on three separate occasions when plaintiff came to visit. On one occasion when she tried to visit her mother, the defendants called the police and had her arrested on charges of criminal trespass. The Sixth Circuit found that "[i]t is certainly within the realm of imagination that hiding a ninety-eight year old, physically infirm mother from her adult daughter, and causing the daughter to be arrested for attempting to visit her mother, could under some set of facts constitute 'extreme and outrageous' conduct, and present a case 'in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Id. at 378, quoting Yeager, 6 Ohio St. 3d at 375.

In his opposition to Covidien's motion, Bagby suggests that under Ohio law, the question of whether a defendant's conduct amounts to "extreme and outrageous conduct" is a question of fact inappropriate for resolution under Rule 12, and citing Lakota School Dist. Bd. of Ed. v. Brickner, 108 Ohio App.3d 637, 650 (Ohio Ct. App. 1996).  But in that case, the court of appeals affirmed summary judgment granted to an employer on a former employee's IIED claim.  The court of appeals noted that the plaintiff had alleged facts that involved "either criticism of appellant's work performance or adjustments in her job duties."  These facts failed to create a material question of fact on whether or not the employer's conduct was "extreme and outrageous" under Yeager.  Bagby's suggestion that all claims for intentional infliction of emotional distress require submission to the trier of fact, or cannot be resolved under Rule 12, is not supported by case law.  As the cases discussed above clearly show, "intentional infliction of emotional distress claims may entirely be dealt with on a motion to dismiss."  Miller v. Currie, 50 F.3d at 377-378, citing Rogers v. Targot Telemarketing Servs., 70 Ohio App.3d 689, 591 N.E.2d 1332 (Ohio Ct. App. 1990), and Baab v. AMR, supra, 811 F.Supp. at 1270.

Accepting all of Bagby's factual allegations as true, as the Court must do at this stage, those allegations fail to state a plausible claim under Ohio law for intentional infliction of emotional distress.  The facts regarding his FMLA leave,

taking away customer accounts or not being provided with necessary sales tools, his supervisor's failure or refusal to respond to his emails, or his decision to leave his position due to stress of the workplace, do not rise to the level of extreme or outrageous conduct sufficient to support his claim as a matter of law.

Covidien's motion to dismiss Count 5 of Bagby's complaint, as well as its motion to dismiss Counts 3, 4 and 6 which Bagby does not oppose, is therefore granted.  **The complaint remains pending** on Counts One and Two, disability discrimination and FMLA discrimination and retaliation.

SO ORDERED.

DATED: August 28, 2012         s/Sandra S. Beckwith
                                Sandra S. Beckwith
                                Senior United States District Judge