**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL BAGBY** | : | Case No.  1:12-cv-00488 |
| | : | Judge Beckwith |
| Plaintiff, | : | Magistrate Judge Litkovitz |
| | : | |
| vs. | : | |
| | : | |
| **COVIDIEN** | : | |
| | : | |
| Defendant. | : | |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

---

Brian P. Gillan (0030013)
Randolph H. Freking (0009158)
TRIAL ATTORNEYS FOR PLAINTIFF
FREKING & BETZ, LLC
525 Vine Street, 6th Floor
Cincinnati, OH  45202
PH: (513) 721-1975 / FX: (513) 651-2570
*bgillan@frekingandbetz.com*
*randy@frekingandbetz.com*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Bagby Was A Successful Sales Executive Under Kelsey's Management.. . . . . . 3

Bagby, who had years of sales experience with IKON Office Solutions, easily completed Covidien's rigorous training program and quickly became an accomplished Sales Representative under his first Spervisor Frank Kelsey. When Bagby concluded that his new Supervisor, Jeremy Korniak, who assumed his supervision from Kelsey, would not allow Bagby to develop his career, Bagby secured another position with Defendant.

      B.    Korniak Learned Of Bagby's Concerns About His Management Before Bagby's Move To California Was Final And Covidien Rescinded The Offer.. . . . . . . . . . 4

While Bagby was preparing to transfer to his new position, he visited his parent's home and discussed his decision with them. During his conversation Bagby expressed concerns about Korniak's Management and accidentally pocket dialed Korniak's cell phone which recorded Bagby's private conversation. Korniak and HR Representative, Meghan Hopkins, claim that Korniak disciplined Bagby for this inadvertent pocket dialing in the form of a verbal warning and then closed the matter. But Korniak told Bagby that as a result of his pocket dialing, his transfer to a new position had been rescinded. In any event, Bagby met Korniak's expectations for fiscal year 2009.

      C.    The Working Relationship Between Bagby And Korniak Was Broken, And Bagby's Mental Health Deteriorated Because Of It.. . . . . . . . . . . . . . . . . . . . . . . 7

After Bagby's inadvertent pocket dialing of Korniak's cell phone, the relationship between them was broken and Bagby's mental health deteriorated because of it.

      D.    Hopkins Suggested A Medical Leave For Bagby in August 2010.. . . . . . . . . . . . 8

Hopkins suggested to Bagby that he take a medical leave to treat his panic disorder, clinical depression, and severe anxiety and Bagby followed her suggestion.

      E.    Bagby Repeatedly Pleaded With Hopkins--Without Success--For A Reintegration Plan For His Return To Work That Would Address The Working Conditions Which Resulted In His Need For Leave.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

When Bagby was ready to return to work from leave, he began asking Hopkins to speak with her and Jeff Koziol, Korniak's Supervisor, to discuss a plan for Bagby's reintegration and address the broken relationship between Bagby and Korniak. Despite Bagby's repeated attempt to schedule these conversations, it

was not until the day before Bagby returned to work that Bagby was allowed to speak with her and Koziol. During that five minute conversation, Bagby was not allowed any input and Hopkins and Koziol did not address Bagby's most pressing concerns, his relationship with Korniak.

F.    Despite Bagby's Repeated Pleas For A Reasonable Accommodation, Nothing Changed When He Returned To Work And Because Of The Untenable Environment, Bagby Was Forced To Resign. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

When Bagby returned to work, he was quickly subjected to a Performance Development Plan even though he had been gone for many months. The PDP increased his sales goals significantly and included some sales goals which were impossible to meet. Faced with Covidien's utter failure to consider any reasonable accommodations for him and the clear message that Covidien was setting him up to fail, Bagby submitted two weeks notice of resignation on April 29, 2011.

IV.   ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A.    Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B.    Bagby Can Establish That Covidien Violated Federal And Ohio Law By Discriminating Against Him On The Basis Of His Disability And Failing To Accommodate His Disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1.   Covidien Violated Ohio Law Prohibiting Disability Discrimination Because It Refused To Reasonably Accommodate Bagby's Disability. . 20

2.   Bagby Can Establish A *Prima Facie* Case of Disparate Treatment Disability Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

a.   Bagby Was Disabled. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

b.   A Jury Could Conclude That Covidien Constructively Discharged Bagby. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C.    Bagby Has Established A Genuine Issue Of Material Fact As To Whether He Was Terminated In Retaliation For Taking Leave Protected By The FMLA. . . . . . . . 26

1.   Bagby Can Establish An Adverse Action. . . . . . . . . . . . . . . . . . . . . . . 27

2.   Bagby Can Establish A Causal Connection Between His Leave And His Constructive Discharge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.    Bagby Can Establish That Covidien's Explanation For Its Adverse Actions Was Pretext For Discrimination And Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . 29

ii

1. Covidien Never Articulated A Reason For The Refusal To Even Consider Removing Bagby From Korniak's Management.. . . . . . . . . . . . . . . . . . 29

2. The PDPs Were Pretext For Forcing Bagby Out.. . . . . . . . . . . . . . . . . . 29

IV. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Bacon v. Honda of America Mfg., Inc., 192 Fed. Appx. 337, 343-344 (6th Cir. 2006). . . . . . . 27

Benaugh v. OCRC, No. 07-3825, 278 Fed. Appx. 501, 511 (6th Cir. May 16, 2008). . . . . . . . 26

Bishop v. Georgia Dept. of Family and Children's Services, 2006 U.S. App. LEXIS 5968 (11th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Blanton v. Inco Alloys Int'l, 123 F.3d 916, 917 (6th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . 20

Brown v. Chase Brass and Copper Co., (6th Cir. 2001) 14 Fed. App.482, 487. . . . . . . . . . . . . 21

Bultemeyer v. Fort Wayne Community Schools, (7th Cir. 1996) 100 F.3d 1281, 1283.. . . . . . . 21

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Chen v. Dow Chem. Co., 580 F.3d 400, n. 4 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

DePiero v. City of Macedonia, 180 F.3d 770, 776 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 19

EEOC v. Avery Dennison Co., 104 F.3d 858, 861, (6th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . 27

EEOC v. Prevo's Family Mkt., Inc., 135 F.3d 1089, 1097 (6th Cir.  1998). . . . . . . . . . . . . . . . . 20

Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 951-952 (8th Cir. 1999). . . . . . . . . . . . 21

Held v. Gulf Oil Company, 684 F.2d 427, 432 (6th Cir. 1982).. . . . . . . . . . . . . . . . . . . . . . . . . . 25

Henry v. Lennox Industries, Inc., 768 F.2d 746, 752-753 (1985). . . . . . . . . . . . . . . . . . . . . 24, 25

Hood v. Diamond Products, Inc., 74 Ohio St. 3d 298, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Hoskins v. Oakland County Sheriff's Dep't., 227 F.3d 719, 724 (6th Cir.  2000). . . . . . . . . . . . 20

Landefeld v. Marion General Hospital, 994 F.2d 178, 181 (6th Cir. 1993). . . . . . . . . . . . . . . . . 19

Leslie v. St. Vincent New Hope, 916 F.Supp 879, 887 (SD Ind. 1996). . . . . . . . . . . . . . . . . . . . 23

Logan v. Denny's, Inc., 259 F.3d 558, 573 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Lovejoy-Wilson v. Noco Motor Fuels, Inc., 242 F. Supp.2d 236, 244 (S.D. NY 2003). . . . . . . 21

Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). . . . . . . . . 29

iv

McCart v. University of Cincinnati Foundation, 2010 U.S. Dist. LEXIS 34406, *1, *20-*21 (J. Spiegel). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Miller v. Fairchild Indus., Inc., 797 F.2d 727, 731 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . 27

Mitnual v. Fairmount Presbyterian Church, (2002) 149 Ohio App.3d 769, 779, ¶45, 778 N.E.2d 1093. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Moore v. Kuka Welding Systems, 171 F.3d 1073, 1080 (6th Cir. 1999). . . . . . . . . . . . . . . 25, 27

Nguyen v. City of Cleveland, 229 F.3d 559, 567 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 28

Ohio Civil Rights Commission v. Ingram, 69 Ohio St.3d 89, 92 (1994). . . . . . . . . . . . . . . 19, 20

Pettit v. Steppingstone Center for the Potentially Gifted, 429 Fed. Appx. 524, 536 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Reeves v. Sanderson Plumbing, 530 U.S. 133, 151 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Shaver v. Wolske & Blue, 138 Ohio App. 3d 653, 664 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . 21

Shepard v. Good Samaritan Hosp., No. 1:08cv357, 2009 U.S. Dist. LEXIS 127405, *1, *33 (S.D. Ohio) (J. Dlott). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Singfield v. Akron Metropolitan Housing Authority, 389 F.3d 555, 563 (2004). . . . . . . . . . 27, 28

Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 314 (6th Cir. 2001). . . . . . . . . . . . . . . 26

Smith v. Chrysler Corp., 155 F.3d 799, 805 (6th Cir.  1998) (citations omitted). . . . . . . . . . . . . 20

Smith v. Midland Brake, 180 F.3d 1154 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996). . . . . . . . . . . . . . . 21

U.S. Airways v. Barnett, 535 U.S. 391, 401 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

West v. Tyson Foods, Inc., No. 08-6516, 374 Fed. Appx. 624, 640 (6th Cir. April 15, 2010). . . 25

Wheeler v. The Southland Corporation, 875 F.2d 1246, 1249 (6th Cir. 1989). . . . . . . . . . . . . . 25

White v. Honda of Am. Mfg., Inc., (S.D. Ohio 2002) 191 F.Supp.2d 933, 950. . . . . . . . . . . . . . 21

## STATUTORY AUTHORITIES

29 U.S.C. §§ 2612(a)(1)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

42 U.S.C. § 12111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 12111 (9)(B).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

42 U.S.C. § 12112(b)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. §12112(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

29 C.F.R. §§ 825.220(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Fed. R. Civ. P. 56.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

O.R.C. §4112.02(A).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.    **INTRODUCTION**

Plaintiff Michael Bagby sued Covidien alleging that it retaliated against him because of

his use of leave protected by the Family and Medical Leave Act ("FMLA"), interfered with his

use of that leave, and discriminated against him on the basis of his disability when it refused to

reasonably accommodate him and forced his resignation.

Bagby sold medical devices to health care providers for Covidien and was good at it.  He

sailed through his training and developed his skills under Frank Kelsey, an experienced Regional

Manager with whom Bagby worked well.   (Hopkins Dep. at 9.)

In 2007, however, Jeremy Korniak, who had no previous experience selling medical

devices, assumed Bagby's supervision.  (Bagby Dep. at 46-47; Hopkins Dep. at 25.)  Bagby was

concerned that he could not develop his skills and advance in the company, and be a stronger

representative of the company under Korniak's supervision.  Thus, in October 2009, Bagby

secured an offer for a new Covidien position in California as he wanted to continue working for

Covidien.

While Bagby was arranging the details of his transfer, he spent an evening with his

parents during which he had a frank conversation regarding his decision to move and the

motivation for it--Bagby's concerns about Korniak's management.  During that conversation,

Bagby had inadvertently dialed Korniak's mobile number on his personal cell phone and

Korniak's voice-mail recorded Bagby's candid comments.  When Bagby realized this, he

attempted many times to contact Korniak to explain the situation and apologize but could not

reach him for several days.

Korniak knew as soon as he started listening to his voice-mail that the recording was

inadvertent, but instead of simply erasing Bagby's private conversation with his parents, Korniak

listened to it and then contacted Meghan Hopkins, HR business partner to the sales force, to

1

determine whether he should discipline Bagby.  (Hopkins Dep. at 6-7, 10.)  Korniak claims that Hopkins told him to issue a verbal warning to Bagby and then drop the matter.  Korniak told Bagby, however, that Covidien had rescinded the offer for the California position because of the incident.

Despite the fact that Bagby met expectations on his 2009 review, the working relationship between Bagby and Korniak began to disintegrate in 2010, and Bagby's mental health began to deteriorate as a result of it.  Bagby told Korniak that he was losing sleep and weight and was experiencing panic attacks and severe anxiety which all were negatively affecting his ability to perform essential job functions and potentially putting patients at risk.  Instead of offering Bagby any meaningful assistance, Korniak issued a performance development plan ("PDP")--the precursor to a performance improvement plan ("PIP") and termination--to him.

Bagby sought help from Hopkins who suggested that Bagby should take a short-term-disability leave of absence, and starting in August 2010, Bagby began his protected leave.  He began his attempt to return to work in November 2010 by contacting Hopkins and asking to speak with her and Jeffrey Koziol, Korniak's Area Vice President and supervisor, to develop a reintegration plan for his return to work which would protect him from retaliation and the hostility on Korniak's part which caused Bagby's anxiety, clinical depression and panic attacks in the first place.   (Korniak Dep. at 12.)  Hopkins admits that Bagby's request for a conversation to draft a reintegration plan **was a request for an accommodation**, and she had previously admitted to Bagby more than once that his relationship with Korniak was **"very broken."** Hopkins likewise admits that Bagby **asked if he could be supervised by somebody other than Korniak**.  As described below, however, Hopkins repeatedly ignored Bagby's emails for days or weeks and then placed the onus on Bagby's doctor to come up with an accommodation plan.

2

After Bagby had asked for a "live" phone conversation approximately 10 times, Hopkins finally arranged for one on the day before Bagby returned to work. The meeting only lasted for five minutes, however, and Hopkins and Koziol did not give Bagby any input into the "plan" for his return to work, and did not address his most pressing issue, Korniak's supervision. Instead, it chose to return to the status-quo.

Within a few weeks of Bagby's return to work, Korniak placed him on another PDP which included goals which Bagby could not possibly reach. Korniak also stripped the Covidien funding for a University of Cincinnati laboratory which was one of Bagby's biggest customers. Korniak's demonstrated desire to be rid of Bagby left Bagby with no choice but to resign and Covidien constructively discharged Bagby in April 2010.

Because a jury would likely conclude that Covidien failed to reasonably accommodate Bagby and retaliated against him because of his use of FMLA leave, summary judgment is not appropriate and Bagby respectfully requests that this Court deny Covidien's Motion.

## II.    FACTS

### A.    Bagby Was A Successful Sales Executive Under Kelsey's Management.

Bagby, who had years of sales experience with IKON Office Solutions, started working for Covidien in September 2006 as a Certified Surgical Specialist and sold disposable instruments that doctors use in abdominal surgery. (Bagby Dep. at 17-19, 23-24, 27, 39-40.) Bagby was part of a team and had a territory that, *inter alia*, included Cincinnati, Oxford, Dayton and Springfield Ohio. (Bagby Dep. at 36.) Bagby's position required him to spend several hours each day in operating rooms with surgeons to support their use of Covidien devices. (Bagby Dep. at 190-191.) When Bagby started, Kelsey, who had significant management skills and training, supervised him and they worked well together. (Bagby Dep. at 26-27, 38, 48.) Bagby's

career with Covidien took off quickly under Kelsey's supervision.  (Bagby Dep. at 26-27, 38, 48.)

Bagby easily completed Covidien's rigorous training program and shortly after one year of employment, earned a promotion to Senior Certified Surgical Specialist.  (Bagby Dep. at 30, 34-36.)  The hospitals in Bagby's territory were committed to Covidien's main competitor, Ethicon, making Bagby's territory very competitive and one of the more difficult in the country. (Bagby Dep. at 63.)  In his first year, however, Bagby was able to convert Cincinnati Children's Hospital and Medical Center from Ethicon products to Covidien's products.  (Bagby Dep. at 64.)

Korniak assumed Bagby's direct supervision in 2007.  (Bagby Dep. at 34.)  When he arrived, Korniak noted Bagby's significant sales activity and passion for training medical professionals on Covidien products.  (Korniak Dep. at 19, 20, 21, 23, 25.)  Bagby, however, was concerned that Korniak's inexperience and lack of influence would make it more difficult to develop his own career; thus in 2009, Bagby secured permission from Korniak to apply for a position in California working for Kevin Starr.  (Bagby Dep. at 53-54, 55-56; Korniak Dep. at 53-54, 56-57.)  Bagby wanted the position because he believed that Starr's supervision and mentoring would offer more professional development opportunities than he had with Korniak (whose career at Covidien had stalled when Korniak left in 2012).  (Hopkins Dep. at 16, 68; Hopkins Dep. Ex. 1 at Covidien 452; Bagby Dep. at 60-61.)  Starr offered Bagby the position in October 2009, and began working with Lesette Johnson, Area Vice President, on a relocation package for Bagby.  (Bagby Dep. Exs. F, G; Bagby Dep. at 72-75, 76-79; Korniak Dep. at 59; Hopkins Dep. at 18-19.)

**B.    Korniak Learned Of Bagby's Concerns About His Management Before Bagby's Move To California Was Final And Covidien Rescinded The Offer.**

While he was preparing to move to California, Bagby visited his parents' home and discussed his decision to move to California.  (Bagby Dep. at 82-84.)  During his conversation,

4

Bagby expressed concerns about Korniak's management and his weakness as a manager compared to Kelsey. (Bagby Dep. at 82-84.) During this conversation, Bagby's personal cell phone inadvertently dialed ("pocket dialed") Korniak's mobile phone and Korniak's voice mail recorded Bagby's candid conversation with his parents. (Hopkins Dep. at 44; Bagby Dep. at 83; Korniak Dep. at 60.) Covidien did not retain the inadvertent voicemail in audio form and the only record of the voicemail was Hopkins hand-written notes. (Hopkins Dep. at 45-46.)

It was clear to Korniak from the recording that this was a private conversation and not a voice-mail message meant for Korniak, and he received a follow-up voicemail from Bagby apologizing for the pocket dialing. (Korniak Dep. at 61, 65.) Moreover, according to Korniak, he viewed Bagby's comments about him was nothing more than an employee blowing off steam. (Korniak Dep. at 65-66.) Nevertheless, Korniak contacted Hopkins about the voice mail, and claims Hopkins instructed him to issue a verbal warning to Bagby for his private conversation with his parents and "close the matter." (Korniak Dep. at 66-67, 68-69, 70-71.)[1] Hopkins admits, however, that Bagby's voicemail did not even **justify a warning** and was certainly not a terminable offense. (Hopkins Dep. at 46, 47.)

Korniak told Bagby a much different story regarding the discipline for the pocket dialing: Korniak expressed to Bagby that he wanted to terminate Bagby, but in lieu of that, he could revoke his transfer and put Bagby on a performance development plan ("PDP"). (Bagby Dep. at 81, 87-89, 92.)

Hopkins claims that Starr decided to rescind the California offer to Bagby allegedly because Bagby had "too much to drink" and "behaved inappropriately" with members of Starr's team at a meeting held after Bagby's successful interview, and allegedly because Bagby was not clear with Korniak regarding Korniak's approval to go to the meeting, all of which Bagby flatly

---

[1] Hopkins claims that it was Koziol who called her about the incident. (Hopkins Dep. at 43-44.)

denies.  (Hopkins Dep. at 19-20; Bagby Dep. at 56; Bagby Aff.  ¶¶ 2, 3.)  In an affidavit attached to Defendant's Motion of Summary Judgment, Starr also vaguely alleges that Bagby acted "inappropriately" during the 3-day meeting after having gotten drunk; he claims this was the reason for the recision.  (Def. MSJ Ex. 6 at ¶ 5.)  But when Bagby asked Starr why the California offer was rescinded, Starr refused to answer, and the letter which rescinded the offer included no reason for the decision.  (Bagby 90-91; Doc. Covidien 269, attached as Pl. Ex. A.)  Hopkins claims that Korniak issued verbal counseling to Bagby about his alcohol use but she does not know if a record of the verbal counseling was in Bagby's personnel file.  (Hopkins Dep. at 35.)[2] Moreover, the Covidien-sponsored party in question occurred on Super Bowl Sunday and Starr, himself, paid bar tabs for guests, many of whom also had too much to drink.  (Bagby Dep. at 69-71; Bagby Aff. ¶¶ 2-3.)

Korniak claims that after Bagby apologized for his pocket dialing, he told Bagby that they were going to move on and that Korniak was only interested in making sure that Bagby had his "head in the game."  (Korniak Dep. at 71.)  According to Korniak, he harbored no ill will toward Bagby because of the pocket dialing incident and considered the matter closed after the verbal warning.  (Korniak Dep. at 81-83; see also, Hopkins Dep. at 50.)

Bagby met Korniak's expectations for fiscal year 2009 on the evaluation which Bagby received approximately one month later in November 2009.  (Bagby Ex. J.)  Korniak praised Bagby for his drive to achieve sales results and noted that Bagby was the number 2 salesman in the region while being in an uncommitted territory.  (Bagby Dep. Ex. J; Bagby Dep. at 120-121.)  Korniak likewise noted that Bagby wanted others on his team to be successful and that he was willing to share "best practices" with other members of the team, and praised Bagby's customer

---

[2]According to Hopkins, Covidien did not require Korniak to submit any of his desk files regarding his employees after he left Covidien.

focus, willingness to go the extra mile, and awareness that "surgeons are the key to his success." (Bagby Dep. Ex. J; Bagby Dep. at 135.)

**C.**  **The Working Relationship Between Bagby And Korniak Was Broken, And Bagby's Mental Health Deteriorated Because Of It.**

Shortly after the pocket dialing incident, Bagby became anxious and depressed, started struggling with serious insomnia, and started losing significant weight. (Bagby Dep. at 145-146, 153.) Bagby sought help from Korniak several times and told him: "I'm not sleeping. I'm losing weight. I can't think straight. I have constant anxiety in and out of work, which was affecting literally, literally everything in my life." (Bagby Dep. at 146-149.) Bagby was "pleading" with Korniak to understand Bagby's health situation, but Korniak did nothing for Bagby other than to give him the number for Covidien's employee assistance program. ("EAP"). (Bagby Dep. at 147, 149; see also, Korniak Dep. at 121.)[3]

On June 20, 2010, Bagby emailed Korniak about a spreadsheet Korniak had asked Bagby to create and to follow up on a conversation they had recently held to talk about Bagby's 2010 sales. (Bagby Dep. Ex. K; Bagby Dep. at 137-138; Korniak Dep. at 89-90.) Bagby told Korniak in that email that "I cannot do well and thrive in a hostile work environment/situation. I am already stressed enough on all fronts, and it is affecting everything in my life, including my health and sleep." (Bagby Dep. Ex. K; Bagby Dep. at 145; see also, Korniak Dep. at 14-15.) Bagby was trying to improve his communication with Korniak and asked Korniak to work with him, not against him. (Bagby Dep. at 138; Korniak Dep. Ex. K.)

Covidien uses progressive discipline which includes verbal and written warnings before termination with a separate track for behavior and performance--the latter of which is managed

---

[3] One line in one of Bagby's medical records identifies June 2010 as the onset of Bagby's mental health condition. (Def. MSJ at 9; Bagby Dep. at 182; Bagby Dep. Ex. Q.) Bagby, however, was not in a particularly lucid state when he spoke to the doctor who completed the forms. (Bagby Dep. at 182-183.) Moreover, that date on this document could be for as early as June 1, 2010, before the placement of Bagby on a PDP.

7

by performance development plans ("PDPs") and performance improvement plans ("PIPs").
(Hopkins Dep. at 47.)  At the end of a PDP period an employee is usually either placed on a PIP
or is successful on the PDP; a failure to meet a PIP's expectations results in termination.
(Hopkins Dep. at 104; Doc. Covidien 17, attached as Pl. Ex. B.)  Korniak drafted an unsigned
45-day PDP for Bagby dated June 21, 2010.  (Korniak Dep. Ex. 1.)  Korniak drafted another PDP
dated June 30, 2010 which was identical to the June 21, 2010 PDP except that it was for 60 days
and included different dates for achieving goals.  (Bagby Dep. Ex. M; Korniak Dep. Ex. 1; Bagby
Dep. at 164-165.)  Korniak did not tell Bagby that he was placing him on a 60-day PDP (starting
July 1, 2010) until June 30, 2010.  (Bagby Dep. Ex. M; Bagby Dep. at 164-165.)

Korniak claims that he issued the PDP to Bagby because he was allegedly struggling.
(Korniak Dep. at 93.)  There were other sales employees at a similar level of performance to
Bagby, however, to whom Korniak did not issue a PDP.  (Bagby Dep. at 167-168; see also,
Hopkins Dep. at 52-53.)

Hopkins is supposed to speak with managers who want to impose a PDP on an employee
to assess the need for one.  (Hopkins Dep. at 51-52.)  Hopkins claims that Korniak shared data
showing that Bagby was not meeting expectations, but she did not know how Bagby's
performance ranked against his teammates.  (Hopkins Dep. at 54.)  Hopkins **admits** that Bagby
told her the PDP was **unrealistic** and that Korniak did not speak to him about the PDP.
(Hopkins Dep. Ex. 1 at Covidien 453; Hopkins Dep. at 70, 73.)

### D.    **Hopkins Suggested A Medical Leave For Bagby in August 2010.**

Bagby called Hopkins about the PDP and in June and again in early August 2010, and
told her that he was under a lot of pressure from Korniak, had been on three different
medications, had lost weight and had trouble sleeping.  (Hopkins Dep. at 38, 39, 61, 72; Hopkins
Dep. Ex. 1 at Covidien 453.) Hopkins suggested that Bagby consider taking a leave of absence

with an anticipated return to work in early December 2010.  (Bagby Dep. at 172-173; see also, Hopkins Dep. at 39-40.)  Upon advice from his psychiatrist, Bagby decided to request leave, which Covidien granted.  (Bagby Dep. Exs. N, O, P; Bagby Dep. at 172-173, 174-175, 192.)  Korniak, who had not previously handled a leave, admits that he was aware that Bagby's leave was necessary for mental health issues.  (Korniak Dep. at 29, 32.)

In October 2010, Bagby was not sufficiently recovered to return to work as he was still experiencing panic disorder and severe anxiety.  (Bagby Dep. at 184, 187, 188; Bagby Dep. Ex. R.)  Brian Dowling, M.D. thus requested another eight weeks of leave for Bagby until early December 2010 for "further treatment of severe clinical depression and anxiety."  (Bagby Dep. at 193.)  Covidien approved the extension.  (Bagby Dep at 193; Bagby Dep. Ex. R; Hopkins Dep. at 110.)

Sarah Corley, an Employee Benefits Representative, advised Bagby that it was "very important" that he get his Short-term Disability ("STD") benefits approved as "Covidien will hold your job open past FMLA as long as STD is approved."  (Bagby Dep. Ex. S; Bagby Dep. at 196.)  Bagby successfully secured those benefits.  (Bagby Dep at 208-209.)

### E.  Bagby Repeatedly Pleaded With Hopkins--Without Success--For A Reintegration Plan For His Return To Work That Would Address The Working Conditions Which Resulted In His Need For Leave.

While he was on leave, Bagby called Covidien's ethics hotline and spoke with Gina Spencer, a Covidien ombudsperson, whose duty is to address or facilitate an investigation when employees share concerns about company practices.  (Hopkins Dep. at 41, 42; Bagby Dep. at 288; Spencer Dep. at 10, 24.)  Bagby told Spencer that about his many concerns regarding Korniak, that they led to his anxiety and deteriorated health, and asked Spencer to be assigned to a new manager.  (Spencer Dep. at 35.)

When Spencer and Hopkins discussed Bagby's return to work, she told Hopkins that Bagby was asking for Hopkins's help to come back. (Hopkins Dep. Ex. 1 at Covidien 459; Hopkins Dep. at 83, 84.)  Spencer also asked Hopkins the possibility of Bagby reporting to a different manager.  (Hopkins Dep. at 84; Hopkins Dep. Ex. 1 at Covidien 459.)  Yet, while Spencer appeared to be concerned with assisting Bagby resolve his situation, she did nothing to help in his return to work.  (Bagby Dep. at 288.)  Instead, Spencer told Bagby he had not "handled himself well."  (Hopkins Dep. Ex. 1 at Covidien 459; Hopkins Dep. at 83.)  Spencer also conveyed her preconceived notions about Bagby when she said something to Hopkins about Bagby "misusing retaliation."  (Hopkins Dep. Ex. 1 at Covidien 459.)

Bagby also tried to enlist help from Hopkins and Koziol to avoid Korniak's retaliation and hostility (which put him on leave in the first place) when he returned to work.  On November 30, 2010, Bagby wrote Hopkins to ask for her help to plan for his reintegration.  (Bagby Dep. Ex. V at MB218; Bagby Dep. at 198-200, 209-210; Hopkins Dep. at 113.)  In his email, Bagby expressed his concern that Korniak did not want to see Bagby returned from FMLA leave. (Bagby Dep. Ex. V at MB218; Hopkins Dep. at 113-114.)  Bagby also referred to his "long road to being healthy" and his "countless hours of therapy" and "several high-dose medications" as well as Hopkins' admission to him that the "situation" between Korniak and Bagby was "broken."  (Bagby Dep. Ex. V at MB218; Hopkins Dep. at 112.)

Hopkins admits that Bagby's request for a reintegration plan was an **accommodation request**, her first and only accommodation situation.  (Hopkins Dep. at 57, 108.)  Moreover, in undated notes of a conversation between Bagby and Hopkins, Hopkins noted that **Dr. Dowling** wanted Bagby to have a reintegration plan to allow Bagby to return to an environment with no hostility.  (Hopkins Dep. Ex. 1 at Covidien 463; Hopkins Dep. at 91-92.)  Bagby told Hopkins in that conversation that he was being "targeted, discriminated [against], [and] treated with

10

hostility," and that he was fearful of working for Korniak.  (Hopkins Dep. at 92; Hopkins Dep. Ex. 1 at Covidien 463.)  Bagby also told Hopkins that he was concerned that he would have a relapse if he returned to the same environment.  (Hopkins Dep. at 94-95; Hopkins Dep. Ex. 1 at Covidien 463-464.)  Nevertheless, Hopkins did not respond to Bagby's November 30, 2010 accommodation request until Bagby sent a follow-up email almost a week later.  (Bagby Dep. Ex. V at MB217; see also, Hopkins Dep. at 112.)

On December 10, 2010, Hopkins asked Bagby to describe his "ideal" return to work situation and Bagby expressed concern that the ideal situation "did not exist" because there was no indication that Korniak had changed.  (Bagby Dep. Ex. W at MB206.)  Nevertheless, Bagby expressed his willingness to participate in a discussion regarding the best plan to return to work and asked Hopkins what options might be available.  (Bagby Dep. Ex. W at 206-207.)  On December 16, 2010, Bagby emailed Hopkins, asked her again to talk so that they could devise a plan for his return to work, and told her that he had a couple of ideas for her consideration. (Bagby Dep. Ex. W at 206-207.)  Hopkins did not respond until late the next afternoon and then only to tell Bagby that she could not "come to any conclusions about next steps" until an unnamed colleague returned to the office.  (Bagby Dep. Ex. W at 206.)

After she rescheduled--at the last minute--the phone call Bagby had requested of her several times, on December 20, 2010, Hopkins emailed Bagby to tell him that--by December 28, 2010--he needed to obtain a letter from his doctor explaining the accommodation he needed. (Bagby Dep. Ex. W at MB204-206; Bagby Dep. at 216.)  Bagby made an appointment with Dr. Dowling to try to obtain the requested letter; while Dr. Dowling was willing to determine whether Bagby could return to work, however, Dr. Dowling was unwilling to write an accommodation letter because he did not believe he had HR expertise necessary to do so.  (Bagby Dep. at 218-219; Bagby Dep. Ex. W at MB204.)  In Bagby's December 21, 2010 email to

11

Hopkins, he told her that the long intervals between his emails and responses and the unwillingness to talk about reintegration made it apparent that Covidien did not want him to return to work  (Bagby Dep. Ex. W at MB203; Bagby Dep. at 220-221.)  Hopkins did not contact Bagby to discuss these serious concerns.  (Hopkins Dep. at 121.)

On December 23, 2010, Hopkins drafted a letter to Dr. Dowling enclosing a job description of Bagby's position and asked Dr. Dowling to advise whether Bagby could perform his job's essential functions.  (Bagby Dep. Ex. X.)  According to Hopkins, Bagby needed to deliver the letter to Dr. Dowling immediately as he had only until January 4, 2011 (12 calendar days over the Christmas and New Year's holiday) to respond.  (Bagby Dep. Ex. X; Bagby Dep. at 223-224.)[4]

On December 31, 2010, Bagby requested a copy of his personnel file.  (Bagby Dep. Ex. Z.)  He also requested to speak with Hopkins before his January 7, 2011 appointment with Dr. Dowling to discuss "next steps" with Hopkins about his return to work.  (Bagby Dep. Ex. Z.)  Bagby told Hopkins that he wanted to meet because he did not believe that his past requests had been given appropriate attention.  (Bagby Dep. Ex. Z; Bagby Dep. at 230-232.)  He also explained to Hopkins that the uncertainty and absence of any plan to address his return to Korniak's supervision and the possibility of retaliation "only causes me more anxiety and panic attacks."  (Bagby Dep. Ex. Z at 866.) Bagby wrote to Hopkins:

> Please help me and respond.  I am at a loss for what to do and where to turn.  I am making my full effort and have been forthcoming and candid and honest.  I just want to be treated fairly and have this situation addressed so that we may move forward. [ ] I sincerely hope the (sic) your lack of responses to many specific questions and requests over the past 30 days are not a company tactic that has the goal of me giving up on the situation and thus forcing me to quit my position.

---

[4]Dr. Dowling was on vacation during this period and Covidien extended the deadline by four days.  (Bagby Dep. Ex. X; Bagby Dep. at 223-224.)

On January 8, 2011, Bagby again wrote Hopkins, this time to tell her that Dr. Dowling "has since written my clearance letter with date of return to work and any accommodations he considers medical related.  As a medical doctor, he can't and won't address any of the established existing human resources issues with medical accommodations on the clearance letter[. T]herefore, I am hereby asking for accommodations via Covidien's Human Resources, can we please discuss relevant additional accommodations that Covidien Human Resources suggest, and agrees as reasonable and prudent per the issues I've documented with you over the past 16 plus months that is largely responsible for the major decline of my physical and mental health that resulted in this medical leave?"  (Bagby Dep. Ex. Z at 863.)

Bagby was concerned that he was going to return to a hostile environment because, *inter alia*, Korniak would not let him even apply for a coveted, committed territory in Akron, Ohio. (Bagby Dep. at 233-235; Korniak Dep. at 118-119.)  Korniak, who made the decision to refuse to interview Bagby, refused to explain his decision to Bagby.  (Bagby Dep. at 234-235.)

On January 11, 2011, Dr. Dowling cleared Bagby to return to work on January 18, 2011 with the accommodation of on-site support in order to ensure proper instruction for the use of Covidien products in the OR.  (Bagby Dep. at 225-227.)  At approximately 4:00 P.M. on January 11, 2011, Hopkins emailed Bagby and copied Audrey Barnett, Senior Administrator Health Services, to tell him that Covidien's company physician, Peter Amato, M.D., would need to consult with Dr. Dowling to "better understand" Dr. Dowling's recommendation and asked Bagby for permission for Dr. Dowling to speak with Dr. Amato.  (Bagby Dep. Ex. AA at MB188.)

Bagby responded that he would be happy to facilitate the call and that he had left a message with Dr. Dowling that Dr. Amato may need to speak with him.  (Bagby Dep. Ex. AA at MB187; Bagby Dep. at 236-237.)  Two days later, Hopkins told Bagby that he could email this

13

consent.  (Bagby Dep. Ex. AA at MB186.)

Bagby gave consent on the next business day.  (Bagby Dep. Ex. AA at MB185-186.)
Bagby told Hopkins that his health information had been leaked throughout the organization and
that he was "humiliated" because of the leak.  (Bagby Dep. Ex. AA at MB 185-186; Bagby Dep.
at 237.)  He also renewed his ever-present--but unfulfilled--request to meet or have a
conversation with Hopkins and Koziol to discuss how he could return to work (which was
supposed to happen the next day) without facing hostility or retaliation.  (Bagby Dep. Ex. AA at
MB185-186.)  Hopkins responded that because Bagby's accommodation had not been
determined, Covidien would need to postpone Bagby's return to work.  (Bagby Dep. Ex. AA at
MB185.)

Bagby asked Hopkins what the next steps after "medical clearance" had been reached
would be and when he could discuss them with HR.  (Bagby Dep. Ex. AA at MB184-185.)  He
also reiterated his growing concern that his return to work was not being handled as promised.
(Bagby Dep. Ex. AA at MB185-186.)  Hopkins responded that Covidien could not discuss any
accommodations until the doctors had consulted.  (Bagby Dep. Ex. AA at MB184.)

On January 26, 2011, Hopkins emailed Bagby to tell him that Drs. Amato and Dowling
had spoken, and that Dr. Amato wanted further clarification from Dr. Dowling.  (Bagby Dep. Ex.
BB at MB178.)  On January 28, 2011, Bagby asked for an update on the medical portion of his
return to work and asked for a time in the next week to discuss next steps for his return including
a conversation with  Koziol and Skip Ashmore, VP Sales and Koziol's supervisor, about
Korniak's treatment of Bagby.  (Bagby Dep. Ex. BB at MB178; Bagby Dep. at 238-241; Hopkins
Dep. at 130-131.)  He also asked Hopkins to whom he could turn to get territory data which he
had already requested but never received.  (Bagby Dep. Ex. BB at MB178.)

Bagby tried again to secure help from Spencer in an email to her on February 1, 2011.

14

(Spencer Dep. Ex. 10; Spencer Dep. at 41-43.)  As he had repeatedly told Hopkins, Bagby explained to Spencer that his anxiety and panic disorders were becoming increasingly severe as Covidien continued to refuse to discuss accommodations with him and asked Spencer to take a more active role in mediating his return to work.  (Spencer Dep. Ex. 10.)  Spencer admits that this email was not the first time she had heard Bagby express these concerns and ask for help returning to work.  (Spencer Dep. at 42.)  Spencer does not recall what she did in response to Bagby's pleas.  (Spencer Dep. at 45, 46.)

On February 2, 2011, Hopkins wrote Bagby with Covidien's plan to return him to work which included the support of another sales representative for two weeks.  (Bagby Dep. Ex. CC at MB903-904; Bagby Dep. at 249; see also, Korniak at 99; Hopkins Dep. at 78.)[5]  There was nothing in this proposed plan to address the working relationship between Korniak and Bagby and the plan included a provision to return to the same PDP which was in place when Bagby started leave.  (Bagby Dep. Ex. CC at MB904; Bagby Dep. at 249.)  Bagby asked **again** for a conference call and noted that the PDP was same plan which Hopkins had agreed was unrealistic and demonstrated that he was "set up" to fail and that resulted from a "very broken situation."  (Bagby Dep. Ex. CC at MB902; Bagby Dep. at 249.)

Hopkins responded with a denial that she had said that Bagby's goals were unattainable but agreed to set up a conference call for Bagby with Koziol and herself (but not Ashmore).  (Bagby Dep. Ex. CC at MB900.)  Hopkins claims that the "themes" of Bagby's new PDP were the same but admits that the sales objectives and strategy had changed.  (Hopkins Dep. at 61.)  Despite the acknowledgment of Bagby's stress and anxiety, nobody considered the possibility of postponing the PDP.  (Hopkins Dep. at 62-63.)  Moreover, it was clear from Hopkins's

---

[5]Korniak characterizes this two week period not as an accommodation period but as a chance to get things like it back and running.  (Korniak Dep. at 99-100, 101.)  Korniak could not explain why Covidien had not already addressed these fundamental tasks associated with Bagby's return.  (Korniak Dep. at 108-109.)

dismissive notes about Bagby's situation (she wrote that Bagby was "continuing to angle for a new boss - not going to happen") that Covidien refused to even consider the most important accommodations Bagby needed, help dealing with the situation with his boss which caused his need for leave in the first place.  (Hopkins Dep. Ex. 1 at Covidien 457.)

Thus, when Koziol and Hopkins **finally** met with Bagby to "discuss" accommodations for his return to work, the meeting lasted approximately five minutes.  (Bagby Dep. at 210-211, 241-243.)  Moreover, Koziol and Hopkins controlled the entire conversation and allowed Bagby no input.  (Bagby Dep. at 241-242, 247-248.)  Hopkins and Koziol indicated to Bagby that when he returned to work, it would be a return to the status quo.  (Bagby Dep. at 242-243.)  Neither Koziol nor Hopkins discussed the reason for his leave, his relationship with Korniak, or the lack of opportunities under him.  (Bagby Dep. at 244-245.)  Hopkins and Koziol only responded that Korniak and Bagby would have to learn to get along.  (Bagby Dep. at 247-248.)

Bagby also wrote Spencer again on February 2, 2011 reiterating his concerns that he was to be placed again on a PDP and that he was being set up to fail as soon as he returned to work.  (Spencer Dep. Ex. 9; Spencer Dep. at 49-50.)  Bagby also complained to Spencer that Covidien was refusing to help him return to work in retaliation for his leave and because of his disability.  (Spencer Dep. Ex. 9.)  Despite the serious nature of Bagby's accusations, Spencer does not recall raising the issue to Hopkins or anybody in Covidien's legal department.   (Spencer Dep. at 50.)  Spencer does not recall her conversation with Bagby about this email either.  (Spencer Dep. at 52.)

### F.    Despite Bagby's Repeated Pleas For A Reasonable Accommodation, Nothing Changed When He Returned To Work And Because Of The Untenable Environment, Bagby Was Forced To Resign.

Bagby returned to work the middle of February 2014, 10 weeks after he began pleading with Hopkins to begin the return-to-work process.  (Bagby Dep. at 249.)  Korniak admits that

Bagby was very excited to be back at work and focused on how to get back in the job.  (Korniak Dep. at 31, 99.)

On February 16, 2011, Spencer finally substantively responded to Bagby's repeated requests for her help.  (Spencer Dep. Ex. 2.)  Her response, however, offered no help; instead, she told Bagby that she had no authority to change any determination made by HR and that Covidien "does not make a practice of reassigning employees."  (Spencer Dep. Ex. 2.)

Hopkins admits that Bagby had told her about his stress and anxiety upon his return to work and that Bagby's slow reintegration created by IT and other issues caused Bagby's anxiety to resurface.  (Hopkins Dep. at 58-59.)  Nevertheless, after his short accommodation period, Bagby was back on his PDP, even though he had been gone for 7-8 months and despite the competitive nature of his territory.  (Bagby Dep. at 251; see also, Korniak Dep. at 115.)  Moreover, Korniak took away Southview Hospital in Dayton, which was one of Bagby's major hospitals, and gave it to a teammate.  (Bagby Dep. at 252, 254.)

Additionally, Bagby's sales goals increased significantly when he returned from leave, and some of them were impossible to meet.  (Bagby Dep. at 255.)  One of them was to "take competitive share" of Endo Stapling (TriStaple).  (Bagby Dep. Ex. EE at MB130.)  TriStaple was a new product at the time and on back order.  (Bagby Dep. at 264-265.)  There were no samples available for demonstration, and accounts could only order if they were turned on; none of Bagby's accounts were turned on, so he could not sell the product.  (Bagby Dep. at 264-266; Korniak Dep. at 112.)  The same unrealistic goals for TriStaple were included on Bagby's PDP and was one of only two sales-oriented goals on the PDP.  (Bagby Dep. Ex. FF; Bagby Dep. at 268-269.)  The PDP also included closing deals on other devices which had been launched during Bagby's absence and for which **he had not achieved the necessary certification**. (Bagby Dep. at 270-271.)

Korniak was also out to sabotage Bagby in other ways.  There was a resident lab at UC (which was Bagby's biggest customer) that had been funded with Covidien's money and employee time.  (Bagby Dep. at 280-281.)  In March or April 2011, Korniak refused to renew its funding but at the same time provided funding for a colleague's lab.  (Bagby Dep. at 281-283.)  Bagby was left giving his biggest customer the bad news without being able to provide an explanation.  (Bagby Dep. at 282.)

Bagby told Korniak and Hopkins that his PDP was unachievable.  (Bagby Dep. at 271.)  Hopkins and Korniak told Bagby they expected him to meet the plan's expectations, and throughout February and March 2011, Korniak repeatedly reminded Bagby that the PDP would expire in 60 days, and if Bagby had not met its goals, that he would be placed on a PIP--which only gave him 30 days to meet his goals before termination.  (Bagby Dep. at 271, 274-275, 276.)

Bagby described his situation at the time of his constructive discharge this way:

> We were moving toward the end of this plan [the PDP] and things were so bad, things were so bad [ ], I don't have product, I don't have any accounts turned on, I have got this plan looming, I have got the threat of a PIP coming afterwards, I was dead in the water.  And I had no direction to turn.  I had no help internally.  I was left - I was hung out to dry.  I had no where to turn.  The organization turned its back on me.  (Bagby Dep. at 274.)

Faced with a wholly untenable situation for which he had repeatedly sought an accommodation, Bagby submitted two weeks notice of resignation on April 29, 2011.  (Bagby Dep. Ex. GG; Bagby Dep. at 277-278.)

## IV.  ARGUMENT

### A.  Summary Judgment Standard

Summary judgment may only be granted if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  As the party moving for summary judgment, Covidien bears the burden of showing the absence of a genuine issue of material fact as to at least one element of Bagby's claim.  *Celotex Corp. v. Catrett*, 477

18

U.S. 317, 324 (1986).  If Covidien meets the burden, Bagby must then present evidence that reveals a genuine issue for trial.  *Id.*

This Court must accept Bagby's evidence as true and draw all reasonable inferences in his favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), viewing all facts and inferences drawn therefrom in the light most favorable to him.  *DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999).  When deciding a Rule 56 motion, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 151 (2000). Therefore, disputes over facts that might affect the outcome of the suit will preclude entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Landefeld v. Marion General Hospital*, 994 F.2d 178, 181 (6th Cir. 1993).

> **B.      Bagby Can Establish That Covidien Violated Federal And Ohio Law By Discriminating Against Him On The Basis Of His Disability And Failing To Accommodate His Disability.**

Federal and state law prohibits discrimination against employees on the basis of a disability.  Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111; O.R.C. §4112.02(A).  For example, Ohio law makes it unlawful for an employer to limit, segregate, or classify an employee in a way that adversely affects the opportunities or status of the individual because of his disability, to deny equal job opportunities or benefits, or to fail to make reasonable accommodations to an employee with a disability.  42 U.S.C. §12112(a)  *Ohio Civil Rights Commission v. Ingram*, 69 Ohio St.3d 89, 92 (1994) (Ohio courts apply federal law on state discrimination claims).

"The thesis of the [ADA] is simply this: That people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant

medical evidence and the abilities they have." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (citations omitted). "The statute seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life, including the workplace." *U.S. Airways v. Barnett*, 535 U.S. 391, 401 (2002). The ADA thus serves to "prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics." *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (6th Cir. 1998). This objective "will sometimes require affirmative conduct to promote entry of disabled people into the workforce." *Barnett*, 535 U.S. at 401.

### 1. Covidien Violated Ohio Law Prohibiting Disability Discrimination Because It Refused To Reasonably Accommodate Bagby's Disability.

Failure to reasonably accommodate an employee with a disability is unlawful disability discrimination. 42 U.S.C. § 12112(b)(5); *Hoskins v. Oakland County Sheriff's Dep't.*, 227 F.3d 719, 724 (6th Cir. 2000)*; Ohio Civil Rights Commission v. Ingram*, 69 Ohio St.3d 89, 92 (1994) (Ohio courts apply federal law on state discrimination claims). Because a jury would likely conclude that Bagby's constructive discharge resulted from his disability, Bagby can establish a *prima facie* case of disability discrimination under the ADA by showing that he (1) has a disability; (2) is "otherwise qualified" for the position with or without reasonable accommodation; and (3) his proposed accommodation was objectively reasonable. *Blanton v. Inco Alloys Int'l*, 123 F.3d 916, 917 (6th Cir. 1997) (supplemental opinion); *Hoskins*, 227 F.3d at 724 (*citing Maenad*, 90 F.3d at 1186). Once Bagby establishes these elements, Covidien must prove that the challenged job function is essential, or that a proposed accommodation will impose an undue hardship. *Blanton*, 123 F.3d at 917; *Hoskins*, 227 F.3d at 724.

20

Federal courts have recognized that an employer, when faced with a request for reasonable accommodation by an employee, has a duty to interact with an employee in a good faith effort to seek a reasonable accommodation. *Taylor v. Principal Financial Group, Inc*., 93 F.3d 155, 165 (5th Cir. 1996), *Fjellestad v. Pizza Hut of America, Inc*., 188 F.3d 944, 951-952 (8th Cir. 1999). *See also, Shaver v. Wolske & Blue*, 138 Ohio App. 3d 653, 664 (2000). A jury can consider an employer's failure to engage in an "interactive process" to find a reasonable accommodation when an employee requests one as evidence supporting the plaintiff's *prima facie* case proof that the employer may have been acting in bad faith or in reckless indifference to the plaintiff's federally protected rights. *Lovejoy-Wilson v. Noco Motor Fuels*, Inc., 242 F. Supp.2d 236, 244 (S.D. NY 2003). When examining a breakdown of the interactive process, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. Courts have found a lack of good faith in a party's obstruction or delay of the interactive process. *Bultemeyer v. Fort Wayne Community Schools*, (7th Cir. 1996) 100 F.3d 1281, 1283, *cited by Brown v. Chase Brass and Copper Co.,* (6th Cir. 2001) 14 Fed. App.482, 487. Moreover, as part of the interactive process, Defendant was "required to make a reasonable effort to determine the appropriate accommodation." *White v. Honda of Am. Mfg., Inc.,* (S.D. Ohio 2002) 191 F.Supp.2d 933, 950. Finally, as the court in *Mitnual v. Fairmount Presbyterian Church,* (2002) 149 Ohio App.3d 769, 779, ¶45, 778 N.E.2d 1093, noted whether or not the parties interacted in a good faith effort to find a reasonable accommodation are matters left up to the jury.

Covidien violated Ohio law prohibiting disability discrimination because it failed to reasonably accommodate his disability or to even engage in good faith in an interactive process to determine a reasonable accommodation for him. In moving for summary judgment, Covidien did not address its responsibility to reasonably accommodate Bagby, but a jury need only

21

consider the fact that Bagby asked Hopkins--without success-- no less than 10 times over the course of approximately 12 weeks to meet so that they could discuss how to change the working conditions which resulted in the deterioration of his mental condition to conclude that Covidien did not engage in good faith in the interactive process.  Such a conclusion is reinforced by the expressed suspicion by Covidien's ombudsperson that Bagby was "misusing retaliation" and Hopkins's expressed refusal to consider changing Bagby's supervisors despite suggestions by Bagby, his doctor and Covidien's own ombudsperson that this could be a reasonable accommodation.  See *supra* Section II.E.

Bagby anticipates that Covidien will claim that it reasonably accommodated Bagby because Hopkins postponed the PDP which contributed to his need for leave, placed a support person in the OR with Bagby for two weeks, and agreed to a conversation between herself, Bagby, and Koziol.  A jury would likely reject these arguments, however.  When Hopkins finally agreed to the conversation for which Bagby had been pleading for months, it was perfunctory and not interactive in the least.  See *supra* Section II.E. Further, while Dr. Dowling requested the support person for Bagby in order to return him to work, this was not the only step necessary to reasonably accommodate Bagby's return.

A jury could consider Covidien's refusal to reassign Bagby to different supervision despite his repeated requests for an intervention into the relationship between himself and Korniak.  The ADA clearly contemplated such reassignment as a possible reasonable accommodation as it explicitly provided that "the term 'reasonable accommodation' may include" "job restructuring [or] reassignment to a vacant position."  42 U.S.C. § 12111 (9)(B).  Other courts have noted that an employer may be obligated to reassign an employee as a form of a reasonable accommodation.  "Where other forms of accommodation are not reasonable but reassignment would be reasonable under all the circumstances, the plain language of the ADA

may require reassignment even if the employer does not have a regular practice of permitting non-disabled employees to transfer." *Leslie v. St. Vincent New Hope*, 916 F.Supp 879, 887 (SD Ind. 1996). Bagby anticipates that Covidien will claim in its Reply that it had no duty to reassign Bagby because he did not identify any vacant positions for which he was qualified. As the court in *Smith v. Midland Brake* held, however, the employer should consider reassignment if an employee has indicated a "desire to remain with the company despite his or her disability and limitations," even if the employee did not formally request reassignment. 180 F.3d 1154 (10th Cir. 1999). Covidien failed to consider Bagby's reassignment or even intervention in the relationship between Bagby and Korniak. A jury could determine the failure to take even this step as a failure to accommodate. See, e.g., *Bishop v. Georgia Dept. of Family and Children's Services*, 2006 U.S. App. LEXIS 5968 (11th Cir. 2006) (where the court held that closer supervision, including more frequent meetings between the employee and supervisor, can be a reasonable accommodation for a bipolar employee).

### 2. Bagby Can Establish A *Prima Facie* Case of Disparate Treatment Disability Discrimination.

As Covidien acknowledges, Bagby can establish his *prima facie* case for disability discrimination under Ohio law by showing that: "(1) he was an individual with a disability; (2) he was subjected to an adverse employment action or was treated differently than similarly-situated employees because of his alleged disability; and (3) he could safely and substantially perform the essential functions of his job despite his alleged disability." (Def. MSJ at 15) citing *Hood v. Diamond Products, Inc.*, 74 Ohio St. 3d 298, ¶1 of syllabus (1996). Covidien does not dispute the third element of this analysis, that Bagby could perform the essential functions of his job. (Def. MSJ at 15-21.) Further Bagby has established a question of fact regarding his status as disabled and whether he was subject to an adverse action.

23

### a.  Bagby Was Disabled.

Notwithstanding Covidien's footnoted argument claiming otherwise, there is no reasonable dispute that Bagby was disabled.  (Def. MSJ at 15, n. 9.)  As the ADA Restoration Act explained, in enacting the ADA, "Congress intended that [it] 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and 'provide broad coverage.'" ADA Restoration Act 110 P.L. 325, Sec. 2(a)(1).  As such, the primary object of attention in cases brought under the ADA "should be whether entities covered under the ADA have complied with their obligations," and the "question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." 110 P.L. 325, Sec. 2, (b)(5)

It is undisputed that Bagby suffered from depression, anxiety and panic attacks which were so severe that he received short term disability leave.  His need for high dose medication to control his condition continued even after he returned to work.   Thus, a jury would likely conclude that Bagby was actually disabled.  It would also likely conclude that Bagby had a record of a disability and that he was regarded as disabled.  It is undisputed that Hopkins knew that Bagby had received disability benefits and Bagby told Korniak upon his return to work about the high doses of medication he had taken to control his anxiety when they met upon his return to work.  (Bagby Aff. ¶ 4.)  This is sufficient to satisfy the broad definition of disability contemplated by the ADA Restoration Act.

### b.  A Jury Could Conclude That Covidien Constructively Discharged Bagby.

More than 30 years ago, and for the years following, the Sixth Circuit has repeatedly instructed that the resolution of a constructive discharge case "depends on the facts of each case and 'requires *an inquiry* into the intent of the employer" (i.e., "'the *reasonably foreseeable impact* of the employer's conduct on the employee.'"). *Henry v. Lennox Industries, Inc*., 768

F.2d 746, 752-753 (1985) citing *Held v. Gulf Oil Company*, 684 F.2d 427, 432 (6th Cir. 1982).

(Emphasis supplied.)  In *Henry*, the Sixth Circuit affirmed the trial court's holding that the

plaintiff had been subject to a constructive discharge because the defendant promoted another

employee before her without seriously considering her application, demoted the plaintiff without

explanation, and required her to train the individual who would supervise her, all of which made

her resignation foreseeable to the defendant.  *Id.* at 751.  See also, *Moore v. Kuka Welding*

*Systems*, 171 F.3d 1073, 1080 (6th Cir. 1999) (the Sixth Circuit repeated the rule that "intent can

be shown by demonstrating that quitting was a foreseeable consequences of the employer's

actions"); *West v. Tyson Foods, Inc.*, No. 08-6516, 374 Fed. Appx. 624, 640 (6th Cir. April 15,

2010) ("an employer's intent can be shown if the employee quitting is a foreseeable consequence

of the employer's actions")  citing *Held*, 684 F.2d at 432, *Logan v. Denny's, Inc.*, 259 F.3d 558,

573 (6th Cir. 2001).

The Sixth Circuit's decision in *Wheeler v. The Southland Corporation*, which noted the

"well-recognized rule in labor relations that a man is held to intend the foreseeable consequences

of his conduct" is particularly instructive here.  875 F.2d 1246, 1249 (6th Cir. 1989) citing *Held*,

684 F.2d at 432.  *Wheeler* held that the plaintiff's resignation was reasonably foreseeable and the

intent element of constructive discharge was met because "a reasonable employer would have

foreseen that [the plaintiff] would resign, since she was forced to remain in a hostile work

environment without knowledge of [the defendant's] plans" to address the harassment.  *Wheeler*,

875 F.2d at 1250.  Here, it is undisputed that Bagby deeply feared that he would be returning to a

hostile and retaliatory work environment and he repeatedly attempted to enlist the help of

supervisors and HR to avoid such an environment.  A jury could also easily conclude that

Covidien never shared with Bagby--or even created--a plan to avoid the hostility and retaliation

he feared upon his return from work.

25

Instead, it returned Bagby to the broken supervisory relationship which caused the deterioration of his mental health, reverted to a PDP which required Bagby to meet impossible "goals," and removed and interfered with his most lucrative accounts.  See *supra* Sections II.E, F.

The Sixth Circuit's decision in *Benaugh v. OCRC*, is similarly instructive.  No. 07-3825, 278 Fed. Appx. 501, 511 (6th Cir. May 16, 2008) citing *Held* at 684 F.2d at 432.  In *Benaugh*, the Sixth Circuit found a jury question on constructive discharge when an employer refused a plaintiff an accommodation because it was reasonably foreseeable that the denied accommodation would force the plaintiff to take disability retirement early.  *Id*. at 512.  Here, Covidien similarly denied Bagby reasonable accommodations when it refused to engage with him to address the broken relationship between him and his manager.

### C. Bagby Has Established A Genuine Issue Of Material Fact As To Whether He Was Terminated In Retaliation For Taking Leave Protected By The FMLA.[6]

The FMLA entitles an employee to up to 12 weeks of leave per year if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. §§ 2612(a)(1)(D).  An employer is prohibited from discriminating against employees who have taken FMLA leave and may not use the taking of FMLA leave as a negative factor in terminating an employee.  29 C.F.R. §§ 825.220(c); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).  To establish a *prima facie* retaliation claim, Bagby must show: 1) he availed himself of a protected right under the FMLA; 2) he was adversely affected by an employment decision; and 3) there was a causal connection between the adverse action and the leave.  *See Id.*  Once Bagby has established these elements, Covidien must articulate a legitimate, non-discriminatory reason for Plaintiff's discharge under the *McDonnell Douglas* burden shifting analysis.  *Id.,* at 315-316.  The burden then shifts back to Plaintiff to

---

[6]Bagby does not dispute dismissal of his claim that Covidien interfered with his use of FMLA.

establish that Defendant's legitimate, non-discriminatory reason was merely a pretext for discrimination.

Pursuant to *EEOC v. Avery Dennison Co.*, 104 F.3d 858, 861, (6th Cir. 1997),  the burden of establishing  a *prima facie* case of retaliation is easily met.  The Sixth Circuit in *Moore v. Kuka*, 171 F.3d 1073, 1080 (1999) held that an employee may establish a causal connection between the adverse employment action and the protected activity by demonstrating  that the adverse action was taken shortly after the plaintiff engaged in protected activity and by showing he or she was treated differently from other employees.    The Sixth Circuit in *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (2004) cited with approval other courts that have held "[c]ausation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge."  *Citing Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986).

### 1.     Bagby Can Establish An Adverse Action.

As discussed extensively *supra* in Section III.B.2.b, a jury would likely conclude that Covidien constructively discharged Bagby thus satisfying the easily met adverse action element. A jury could also consider the PDPs which Korniak issued to Bagby after the onset of his mental illness symptoms to constitute adverse actions.[7]  As the Sixth Circuit held in *Bacon v. Honda of America Mfg., Inc.*, disciplinary action which forms the basis for a termination are clearly adverse actions.  192 Fed. Appx. 337, 343-344 (6th Cir. 2006)

Covidien itself admits that when an employee cannot meet the expectations outlined on a PDP, its policies require the issuance of a PIP and a failure to meet a PIP may result in

---

[7]Covidien's claim that there is no question that Bagby's first PDP predates the onset of his illness is without merit.  (Def. MSJ at 9.)  As described *supra* in Section II.C, Bagby testified that his symptoms began shortly after the pocket dialing incident in late 2009, before his PDP in 2010.  Moreover, even assuming, *arguendo*, that Bagby's medical records establish the onset of his symptoms, he told his doctor they started sometime in June. The first PDP Korniak issued to Bagby was dated for the last day of June and Bagby did not receive it until July 1.

termination.  (Def. MSJ at 7-8.) A jury could thus conclude that the PDPs Korniak imposed on Bagby (which he could not possibly meet) placed him on a path to termination and thus constituted adverse actions.

**2. Bagby Can Establish A Causal Connection Between His Leave And His Constructive Discharge.**

Here, Covidien began laying the groundwork for Bagby's constructive discharge before he even returned from leave.  As early as November 30, 2013, **while he was on leave**, Bagby began asking for assistance in returning from leave into an environment free from hostility and retaliation and predicting that a return to the same environment which he left could cause a relapse, and for at least 12 weeks, Hopkins refused to address his request.  The timing in this case thus clearly falls within the line of cases holding that temporal proximity by itself is sufficient to establish a causal connection.  See e.g., *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three months was sufficient to find causation); *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (retaliatory action taken almost immediately after protected activity is sufficient to establish a causal connection); *Shepard v. Good Samaritan Hosp.*, No. 1:08cv357, 2009 U.S. Dist. LEXIS 127405, *1, *33 (S.D. Ohio) (J. Dlott) (termination occurring six weeks after use of FMLA leave was sufficient to meet easy burden of establishing a causal connection).

This evidence of timing is reinforced by the evidence of pretext discussed *infra* in Section III.D which also helps Bagby meet his easy *prima facie* burden.  See, *Pettit v. Steppingstone Center for the Potentially Gifted*, 429 Fed. Appx. 524, 536 (6th Cir. 2011) (recognizing "the appropriateness of plaintiff's presentation of overlapping evidence in support of both the causal connection element of the *prima facie* case and the pretext stage); *Shepard v. Good Samaritan Hosp.*, No. 1:08cv357, 2009 U.S. Dist. LEXIS 127405, *1, *33 (S.D. Ohio) (J. Dlott) (same).

28

### D.    Bagby Can Establish That Covidien's Explanation For Its Adverse Actions Was Pretext For Discrimination And Retaliation.

To establish that Defendant's explanation for the termination is unworthy of belief, Bagby may show that "(1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate his discharge, or (3) they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). As this Court emphasized, however, the "Sixth Circuit has cautioned that courts should 'avoid formalism' in the application of this test, 'lest one lose the forest for the trees.' Pretext. . . 'is a common sense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is.' At base, then, the Manzer test can be distilled to one simple requirement here: Plaintiff must produce sufficient evidence such that a reasonable jury could doubt [Defendants'] stated reasons for its actions." *McCart v. University of Cincinnati Foundation*, 2010 U.S. Dist. LEXIS 34406, *1, *20-*21 (J. Spiegel), citing *Chen v. Dow Chem. Co.*, 580 F.3d 400, n. 4 (6th Cir. 2009).

### 1.    Covidien Never Articulated A Reason For The Refusal To Even Consider Removing Bagby From Korniak's Management.

A jury would likely conclude from the multitude of emails that Bagby sent both Hopkins and Spencer that a return to Korniak's supervision, especially with no plan regarding how to manage the relationship, made Bagby's constructive discharge easily foreseeable. Covidien has not articulated a legitimate, non-discriminatory reason for the refusal to consider removing Bagby from Korniak's supervision. This by itself prohibits summary judgment.

### 2.    The PDPs Were Pretext For Forcing Bagby Out.

A jury would likewise likely reject both of the PDPs issued to Bagby as a pretext for forcing him out because of his disability and/or in retaliation for his use of FMLA leave. As

discussed *supra* in Section II.C, a jury does not have to agree that there was a need to place Bagby on a PDP in the first place as other employees had performed worse than he had without facing a PDP.  Moreover, Hopkins admits that Bagby complained to her that the PDP was unrealistic. A jury could consider this, along with the close timing between Bagby's increasingly ill-health and the first PDP, and conclude that Korniak was papering Bagby's file in an attempt to justify a termination.

A jury would be even more suspicious of the second PDP issued just weeks after Bagby returned to work after being out for more than seven months.  Hopkins admits that all of the financial goals on this PDP were different than the first.  Moreover, as discussed *supra* in Section II.F, the second PDP **included goals which were impossible to meet.**  This fact, especially when coupled with evidence that Korniak started interfering with Bagby's most lucrative accounts at the same time, allows a jury to conclude that Covidien wanted Bagby out.

IV.    <u>**CONCLUSION**</u>

Bagby has established that genuine issues of material fact exist as to each element of his claims.  Further, a genuine issue of material fact exists as to whether Covidien's asserted rationale for acting against Bagby has any basis in fact, did not motivate it to terminate Bagby, or was sufficient to motivate its actions.  Therefore, Bagby respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,
/s/ Brian P. Gillan
Brian P. Gillan (0030013)
Randolph H. Freking (0009158)
TRIAL ATTORNEYS FOR PLAINTIFF
FREKING & BETZ, LLC
525 Vine Street, 6th Floor
Cincinnati, OH  45202
PH: (513) 721-1975 / FX: (513) 651-2570
*bgillan@frekingandbetz.com*
*randy@frekingandbetz.com*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail, e-mail and/or facsimile to those parties who are not served via the Court's electronic filing system.  Parties may access this filing through the Court's System.

/s/ Brian P. Gillan