UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Michael Bagby,                              :    Case No. 1:12-cv-488
                                            :
            Plaintiff,                      :
                                            :
vs.                                         :
                                            :
Covidien,                                   :
                                            :
            Defendant.                      :

**ORDER**

Before the Court is Defendant's motion for summary judgment.  (Doc. 24)

Defendant seeks entry of judgment on Plaintiff's claims of disability discrimination and

FMLA interference and retaliation.  Plaintiff opposes Defendant's motion (Doc. 31), and

Defendant has filed a reply.  (Doc. 32)  For the following reasons, the Court will grant

Defendant's motion.

**FACTUAL BACKGROUND**

Michael Bagby began working for Covidien (f/k/a Tyco Healthcare Group) in

September 2006 as an account representative in Covidien's United States Surgical

division.  Bagby's primary job was selling Covidien's surgical and medical instruments to

hospitals and physicians; his sales territory included Cincinnati, Oxford, Dayton, and

Springfield, Ohio, along with one hospital in southeastern Indiana.  Bagby initially

reported to Frank Kelsey, the Ohio Regional Manager.  Bagby respected Kelsey and

Kelsey was a main reason that Bagby accepted the job with Covidien.  (Bagby Dep. at

37-38)  In 2007, Kelsey promoted Bagby to Senior Account Representative with the

company, the title he kept until he resigned his position in April 2011.

In late 2007, Covidien realigned its regional management team, and reduced Kelsey's regional responsibilities. Jeremy Korniak became Bagby's new Ohio Regional Manager. Korniak was new to Covidien but had sales and managerial experience with another company. Bagby thought Kelsey was a better manager than Korniak, and almost from the start Bagby "inwardly" questioned Korniak's ability to manage him. (Bagby Dep. at 47-48) In late 2007 or early 2008, Bagby applied for a lateral transfer to a sales position for the Ohio State University in Columbus. Another Covidien employee, Buzz Mihalich, was chosen for that position. Bagby believes that he was more qualified than Mihalich. Bagby also asserts that Korniak provided more opportunities for training and development to other employees than he did to Bagby, particularly Mihalich and John James, because they "bonded" with Korniak while they all attended training together. (Bagby Dep. at 103-104)

In late summer or fall of 2009, Bagby decided to apply for a lateral transfer to a sales position in California, supporting the Kaiser Hospital territory. That position reported to Kevin Starr, Covidien's Regional Manager for that area. Internal company policies require an employee who wishes to pursue a lateral transfer to obtain permission from his or her current regional manager. Bagby asked Korniak, who expressed no opposition to Bagby's transfer application. Bagby applied for the job and he attended the California regional sales meeting sometime in late October, which took place at the same time that the Ohio regional meeting took place in Chicago, Illinois. (Bagby Dep. at 68-69) During a social event at the California meeting, Bagby had too much to drink; Kevin Starr states in his affidavit that Bagby behaved inappropriately and unprofessionally. (Doc. 24, Ex. F, Starr Affidavit at ¶5) Bagby admits that he was

drunk, but claims that Starr was paying for drinks for other guests who also drank to excess.  (Doc. 31, Ex. 2, Bagby Aff. at ¶3 )  Covidien had issued a letter to Bagby on October 26, written by Laura Gallant (Covidien's Staffing Manager), offering him the Kaiser position.  (Doc. 24, Ex. E)  After the sales meeting, Starr and Gallant called Meghan Hopkins (Covidien's Human Resources manager) to discuss the incident. According to Hopkins, Starr said that Bagby had behaved inappropriately with members of Mr. Starr's team, which made Starr feel uncomfortable.  He also told Hopkins that the communication between Bagby and Korniak about Bagby attending the meeting "was not open and clear, as far as the approval to go to the meeting."  (Hopkins Dep. at 19) Starr decided to rescind Bagby's job offer, and Hopkins told him that she was comfortable with that decision.  Gallant called Bagby on November 2 to tell him that the offer was rescinded; she sent a followup letter confirming their conversation on November 13, 2009.

During this time period (there is no record of the precise date), Bagby visited his parents on a Friday evening after work, and discussed his job situation and his decision to move to California.  He inadvertently "pocket-dialed" Korniak's Covidien phone number during this conversation, and Korniak's voicemail recorded Bagby's comments to his parents.  Bagby admitted that he said some negative things about Korniak and about Korniak's manager (Jeff Koziol), but he could not remember what he specifically said.  He admitted that he was complaining about Korniak's management capabilities, because Bagby believed that his career "was going nowhere" and that Korniak did not have the "political capital" that Kelsey had with the company.  Bagby realized later that same evening that he had dialed Korniak's number, and began trying  to contact

Korniak to acknowledge the incident.  Bagby testified that Korniak called him the following Monday morning, saying he had heard the voicemail and "disciplinary action to follow."  (Bagby Dep. at 86)  Bagby met with Korniak a short time later at a local hospital (one of Bagby's accounts); according to Bagby, Korniak said he had tried to fire him. Because there was no company policy violation involved with Bagby's voicemail, Korniak could not do so.  Bagby claims that Korniak told him he was revoking Bagby's "promotion" by rescinding Korniak's approval for his lateral transfer to San Francisco. Korniak also told Bagby that he would be placed on a performance development plan and given a book to read.  (Bagby Dep. at 86-88)  Bagby also received a telephone call from Kevin Starr and Hopkins, who informed him that the transfer offer was being rescinded.  Bagby did not recall whether Starr or Hopkins gave him a reason.  (Bagby Dep. at 89-90)

Korniak listened to the inadvertent voicemail.  He testified that he recalled Bagby making "very specific and negative comments ....  I can't give you the exact verbiage, other than I remember words like, they don't know what they're talking about, I know them better than they know me.  At the time he was kind of referring to upper management, more like senior management.  Some other negative things about Covidien, that I took from he's very down on Covidien ...".  I remember terms like they're looking for a robot, that's one of the negative things at the Covidien level ...".  Korniak heard someone asked a question about him, and Bagby said "he's an all right guy, he's okay; however, he's a middle manager with no authority, he's a puppet." (Korniak Dep. at 62-63)  Hopkins testified that Korniak and Jeff Koziol (Korniak's supervisor) contacted her about the voicemail, and that Korniak played it for her.  According to her hand-

written notes, she heard Bagby say "I'm too good for these guys ... they want some homogenized... I know these people better ...".  Bagby said that Jeff Koziol was "powerless middle management[,] he needs other approvals."  Bagby called Jeremy [Korniak] a "puppet - he's weak."  (Hopkins Ex. 1)   Hopkins counseled Korniak to talk to Bagby about the incident, and "to close out the issue with him."  (Hopkins Dep. at 46)

After this incident, Bagby felt that Korniak was treating him differently even though he had not violated any company policy, because Korniak's feelings were hurt by Bagby's recorded comments.  (Bagby Dep. at 94)  Bagby contacted Hopkins and met with her in person at a national sales meeting in Arizona in early November 2009.  Bagby told Hopkins that unlike Kelsey, Korniak did not coach or mentor him, or conduct "strategizing, outside-the-box thinking" sessions.  Korniak was not helping Bagby take advantage of programs within the company to develop his skills, but was helping other agents in his territory.  Bagby said that every time he tried to engage Korniak in assisting him, Korniak said no, and Bagby believed that the "door was shut" on his efforts.  (Bagby Dep. at 105-106)  He also told Hopkins that other sales representatives had problems with Korniak's management style.  In several emails he sent to Hopkins around this same time, Bagby complained about Korniak's "strange" conduct, and that "it very much smells like a way to run someone out of the company because of an after hours conversation with my parents that was unintended for the recipient...".  (Bagby Ex. I at 2)   Bagby also felt he was being "micromanaged" by Korniak.  (Bagby Dep. at 111)  Bagby attributed Korniak's "hostile" treatment of him to the pocket-dialing incident and to differences in their personalities.  (Id. at 112)

Despite Bagby's perceived difficulties with Korniak, his November 25, 2009

performance assessment (for fiscal year 2009) rated Bagby's competencies as "At Covidien Standard."  Korniak listed Bagby's first strength as "customer focus" and his primary development need as "composure."  With regard to "conflict management," Korniak stated that Bagby "needs to improve in this area.  Michael is passionate in his work but needs to develop in his emotional intelligents [sic] to improve his communication style."  Bagby was improving in the area of "composure," but his "[w]ritten communication is an area of development especially as it relates to emails.  However, Michael is always willing to discuss and is willing to see both sides of the situation when in a debate."  Korniak noted that Bagby was number 2 in the region for new product sales in 2009, and that he wants other members of his team to be successful.  Regarding managing vision and purpose, Korniak noted that he needed "to avoid cynicism as it relates to the overall vision of Covidien.  Understanding the Covidien strategy is an area of development."  Korniak placed Bagby on a behavioral development plan, under which he would assign online courses in areas of communication styles, dealing with conflict, and presentations.  Bagby would also be assigned two books to be read in FY 2010.  (Bagby Ex. J)

Bagby said that his relationship with Korniak did not change during the first part of 2010, despite his impression that Hopkins was going to help him "maybe put something into action."  (Bagby Dep. at 115)  He felt that Korniak had "essentially outcasted me from the group, from the team, and he certainly had a different set of approaches and rules for me," and Bagby complained to Hopkins about Korniak in several subsequent conversations.  (Id. at 117)  Bagby believes that he was the only sales agent whom Korniak placed on a behavioral improvement strategy, and which

Bagby attributes to the pocket-dialing incident.  He also believed that his sales quotas on certain products were unfairly increased, unlike other agents.

The Covidien employee handbook explains the company's policies and procedures for addressing performance issues.  If an employee's performance fails to meet expectations, the manager and an employee are expected to develop a plan to address the shortcomings.  This informal "Performance Development Plan" is intended to document the discussions and the plan.  If the problems are not resolved through a PDP, a formal Performance Improvement Plan ("PIP") may be implemented for 30 days. A PIP can be a prelude to termination if the employee fails to meet the PIP's goals.

During the first half of 2010, Bagby did not meet his sales quotas.  On June 18, 2010, Korniak emailed Hopkins to tell her that he intended to place Bagby on a performance development plan beginning on June 21, and asking for her feedback on his proposed plan.  (Doc. 21, Ex. B)  On June 20, 2010, Bagby emailed Korniak about his "Call to action" document (this is apparently a spreadsheet documenting performance goals) about which they had been communicating.  Bagby had made some changes to this document, and asked Korniak to provide "clarification" to help Bagby "construct a more detailed plan for getting my numbers to a more respectable level, for it is down due to a number of variables, including MANY out of my control."  (Bagby Ex. K; emphasis in original)  Bagby also told Korniak: "The one thing I ask is to work with me, not against me.  I cannot do well and thrive in a hostile work environment/situation. I am already stressed enough on all fronts, and it is affecting everything in my life, including health and sleep.  I feel there are many things you are not telling me, and I feel we absolutely must sit down when you return from ASMBS [a conference] and have

a very open and honest conversation.  If we do not get on the same page, we will not be successful and we will both be frustrated even more.  You play coy, but I know that you know what I am talking about."  (Bagby Ex. K)   Bagby testified that he sent this email in order to "extend an olive branch" to Korniak, and did not receive a response. (Bagby Dep. at 151)  He emailed Hopkins on June 25, telling her that he was going to be meeting with Korniak in a few days and wanted to discuss  "several pertinent items" with her before that meeting.  (Bagby Ex. L)

On June 30, 2010, Korniak placed Bagby on a 60-day performance development plan to run from July 1 to August 27, 2010.  This plan required Bagby to submit written itineraries for his sales calls and updates on his progress, and set specific percentage targets for his sales and for his "Quarterly Priorities."  These "priorities" were apparently discussed during Bagby's "Call to Action" teleconference with Korniak and Koziol. (Bagby Ex. M)  Bagby believed that the development plan was Korniak's way to punish him because of the pocket-dialing incident.  (Bagby Dep. at 168)

In mid-August, prior to completing the development plan, Bagby asked Covidien for a leave of absence, beginning August 16 and continuing to October 11.  Covidien agreed and placed him on leave on August 16; on August 18, Covidien's Benefits Representative, Sarah Corley, sent Bagby a letter explaining that he would continue to receive his salary and must apply for disability coverage through the company's plan with Aetna.  Corley also sent two documents for Bagby to complete in order to document his need for FMLA-protected leave: a written request form and a physician certification.  (Bagby Ex. N)  Bagby's family physician, Dr. Puterbaugh, signed the physician certification on August 31, stating that he was treating Bagby for anxiety

disorder, depression, and panic disorder, with an onset date of June 2010. Dr. Puterbaugh opined that Bagby's condition is "chronic" and that he was being referred for psychiatric treatment. (Bagby Ex. P) Covidien approved Bagby's FMLA leave and told him that his doctor would need to certify his fitness for duty before he could return to work. (Bagby Ex. P) Bagby also applied for short-term disability under Covidien's plan with Aetna, which provides up to 26 weeks of paid benefits. On October 22, Dr. Dowling (Bagby's treating psychiatrist) requested that Covidien extend Bagby's leave for an additional eight weeks until December 6, for ongoing treatment for depression and anxiety. (Bagby Ex. R) Covidien approved this request.

On November 30, 2010, Bagby emailed Hopkins, asking if he could discuss a "re-integration" plan for his return to work. He stated that he "... would like to be ensured I am not going to be treated any differently/unfairly from any other employee. I expect to be put to work in a non-hostile work environment, where the situation is professional and ethical, and that simply was NOT the case when I took FMLA due to my significant health issues largely caused by the situation with local sales management." (Bagby Ex. V; emphasis in original) He further asserted that his situation with Korniak was "broken," and that Hopkins had agreed that this was the case in a prior conversation. He claimed that "ultimately, I was broken down physically and mentally, but unwilling to quit, as I should not be made to quit due to the ridiculous circumstances I was in with one particular person." (Id.) On December 6, Hopkins responded and suggested setting up a telephone call after Bagby's appointment with his psychiatrist on December 7. On December 10, Hopkins and Bagby talked by phone. He wrote an email that morning, stating that he just wanted to work "in a fair manner on

re-integration, where I know with 100% confidence I will not face the same conditions I worked in for a very long time." He said he was afraid of returning to the same job because Korniak was not willing to work with him "fairly." He again asked Hopkins to help him find a "solution" to this problem, and to let him know how many days of vacation or sick time he had left. (Bagby Ex. V)

Bagby sent two followup emails over the next week because he had not heard from Hopkins. On December 17, she told him that she needed to consult with a colleague who was out of the office about his requests, and she would contact him the following week. On December 20, Hopkins informed Bagby that he needed to request an accommodation, and that his doctor should describe the accommodation he needed, the date he could return to work, and the duration of the proposed accommodation. Bagby responded that his doctor was willing to "clear/not clear" him to return work and identify any restrictions on his work, but was not willing to write an "accommodation letter." Bagby felt that responsibility lay with Covidien's Human Resources and not his physician. (Bagby Ex. W at p. 2)

On December 23 at 2 p.m., Hopkins emailed Bagby informing him that as of December 6, he had exhausted his FMLA leave and had not qualified for short-term disability benefits through Aetna. As Bagby had requested an accommodation, she attached a letter to his physician along with Bagby's job description, asking Bagby to give the documents to his physician and to return them no later than January 4. She also invited Bagby to suggest any accommodations that he thought would enable him to perform the essential functions of his position. The letter she gave to Bagby was addressed to Bagby's treating psychiatrist, asking him to advise whether Bagby could

perform his job, and whether there were any restrictions and/or any suggested accommodations that would enable him to return to work. (Bagby Ex. X)

Bagby wrote another email to Hopkins during the evening of December 23, stating that her response made him feel "unwanted and unimportant to Covidien," and that it appeared to him to be an "indirect action to run me out of the organization while attempting to come back" from his medical leave.  He accused Hopkins of ignoring his concerns, which was causing his anxiety and panic disorder to resurface.  (Bagby Ex. W)  But on December 27, Bagby emailed Hopkins to thank her for the follow up, and stating that he would obtain a letter from his physician describing any restrictions "that he may deem necessary, from a medical perspective."  Bagby asked for additional time to submit the statement because he was scheduled to see Dr. Dowling on January 7. Bagby also informed Hopkins that he wanted "to clarify something.  I have not ever asked for an "accommodation" as you mention... .  I have wanted to talk to you about re-entering the job after being medically cleared from a Covidien Human Resource perspective." (Bagby Ex. X, emphasis in original.)  Hopkins extended the date for Dr. Dowling's report to January 8.  And on December 31, at almost 5 p.m., Bagby emailed Hopkins asking for a copy of his employee file, and asking to talk to her about the "next steps" to his return to work.  He told Hopkins that he expected Covidien Human Resources to be "helpful in leading and guiding this transition and work re-integration from serious medical conditions."  He wanted to be sure that his "situation is being taken seriously since I feel it has not been given the attention the circumstances merit.  This is based on the ample documentation of the work situation leading to the deterioration of my mental and physical health which has affected every single aspect of my life.

Currently, the situation is status quo and stagnant.  Thus, I am very cautious and need to be proactive to not have a relapse or be placed back into a situation that would be setting me up to fail again via systemic discreet actions, tactics, and methods."  (Bagby Ex. Z)

Hopkins responded on January 7, reminding Bagby that she had previously told him that "we must go through the formal process regarding your medical clearance and any accommodation that may be needed.  We initiated the formal accommodation process based on your request to me for a 'reintegration plan.'  If you doctor feels that you are able to return to work without an accommodation, he may complete the paperwork and work with Sarah Corley to release you.  Regarding the next steps to which I referred, these cannot be determined until we have medical clearance and/or information about the accommodation needed."  (Id.)  Bagby responded on January 8, telling Hopkins that Dr. Dowling will provide a letter documenting his "medical accommodations," but that he wanted to discuss with Hopkins "accommodations via Covidien Human Resources."  (Id.)

Dr. Dowling's January 11, 2011 letter to Hopkins stated that Bagby could return to work on January 18 with the following work accommodations for two of Bagby's essential job functions: "Mr. Bagby should receive on-site support in and out of the operating room setting (whether giving direct instruction in the OR or conducting in-services for surgeons and clinical staff) in order to ensure proper instruction is provided in regards to the safe and efficacious use of products."[1]  Dr. Dowling invited Hopkins to

---

[1] According to Bagby's job description, essential functions of his job include being able to "verbally deliver clear and concise instruction on the safe and efficacious

contact him with any questions.  (Bagby Ex. Y)

Covidien's medical staff asked for Bagby's consent to speak directly with Dr. Dowling about these proposed accommodations, and Hopkins contacted Bagby, assuring him that only two employees (Dr. Amato, the company medical director, and Audrey Barnett, R.N., the Senior Administrator of Health Services) would be included in that discussion.  Hopkins assured Bagby that they would treat Bagby's medical information and discussions with Dr. Dowling as confidential.  Bagby consented to the contact, but complained to Hopkins that his "ultra sensitive" medical information "has been leaked throughout our organization, and I am highly disappointed and humiliated about this."  Bagby did not give any examples of a "leak" of his medical information. Hopkins postponed Bagby's return to work until the accommodation issues were worked out, but told Bagby that she did not know of anyone else in the company who was aware of his medical condition.  Hopkins assured him that any information he shared with her, with Gina Spencer (Covidien's ombudsman), or with the benefits or medical department has not been disclosed to anyone else.  On January 28, Bagby asked Hopkins to arrange a conference with Jeff Koziol and Skip Ashmore (Koziol's supervisor), so Bagby could discuss "issues" he documented and "even things that have YET to be discussed that are pertinent, that ultimately caused this serious health situation that I have been attempting to return to work from?"  (Bagby Ex. BB; emphasis in original)

---

use of assigned products to customers in and out of the OR [operating room] setting" and to "conduct in-services for surgeons and clinical staff on the safe and efficacious use of products.  Provide support to (OR) staff to prepare the OR for a case using assigned products."  Dr. Dowling's letter was directed to these functions.

On February 2, after Dr. Amato and Dr. Dowling conferred, Hopkins wrote Bagby to describe the specific accommodations that were recommended.  Covidien would assign a knowledgeable sales representative to ride with Bagby on Tuesdays through Thursdays for two weeks following his return to work.  Bagby's clinical appointments should be scheduled on those days.  Hopkins told Bagby that if he accepted this accommodation, she would arrange for his return to work.  She also told Bagby that it was his responsibility to inform Covidien if, at the end of the two-week period, he was unable to do his job without further accommodation.  After the accommodation period, Bagby would be expected to re-engage in the performance development plan that was in place before his leave.  Hopkins also agreed to schedule a conference call for Bagby to speak with her and Koziol.

Bagby responded by asking that Skip Ashmore (Koziol's manager and a VP of Sales) be included in the conference call, and he asked if the performance development plan was the same plan in place before his leave, which Bagby claimed that Hopkins had agreed was "unrealistic and unattainable".  Bagby again complained about Korniak's "retaliation and intimidation." (Id.)  Hopkins responded that the plan would focus on the same areas of development, but the metrics would be updated for the new fiscal year.  She told Bagby that the prior plan included reasonable objectives, and they would be reviewed with him at the outset.  Hopkins also clarified that at no time before during their

> ... many conversations did I state that the plan was 'unattainable' or that you were 'set up to fail.'  As with many of our conversations, you made statements such as this and asked for me to confirm your statement - which I would not. My role during our calls has been: 1) to provide you

> coaching and support to you in managing your relationship with your RM, Jeremy Korniak, 2) to provide clarity on the intent of the PDP (which was to provide you with clear objectives to help improve your sales performance), and 3) understand and investigate the concerns you raised about your RM.
>
> During our in-person conversation at the National Sales Meeting in Arizona in November 2009, I did state that I felt that you and Jeremy have a 'broken relationship.' This statement was based on the situation created by your inadvertently calling Jeremy and leaving a voicemail. The voicemail captured your complaining about and making disparaging remarks about Jeremy and your AVP Jeff Koziol. This action did result in a verbal counseling from Jeremy at the time, which was warranted.

(Id.)

Bagby's formal return to work was scheduled for February 21, 2011. On February 18, Korniak emailed Bagby to welcome him back, and asked to meet with him on February 21 to discuss his territory, and to provide updates on activities, compensation, buckets, products, etc. Bagby told Korniak on Monday, February 21 that he was having difficulties getting his IT account running and getting access to email, and Korniak promised to assist. According to Bagby, they had a "good" meeting on February 24, and a few days later Korniak sent Bagby his own notes of the meeting, outlining Bagby's activities and performance goals. (Bagby Ex. EE) Bagby testified that after the two-week accommodation period, he felt fully capable of performing his job duties, and that he did not require an extended accommodation period that Covidien had offered. (Bagby Dep. at 250-251) His PDP implementation was delayed until March 16 and was scheduled to end on May 12, 2011; the plan set specific development goals in the areas of "Drive for results" (sales targets), interpersonal

communication, and adaptability.   (Bagby Ex. FF)

Bagby believed some of the sales objectives in his plan were not reasonable. One of the new products he was required to sell ("TriStaple") was on back order, and some of his accounts had not been "activated."  He conceded that Korniak worked to get products for him to demonstrate to customers, and at some point Bagby's accounts were re-activated.  Bagby testified that despite some positive steps towards achieving his PDP goals, "things had amped up so hostilely [sic] ... and things were so bad ... I have got the threat of a PIP coming afterwards, I was dead in the water."  (Bagby Dep. at 274)  He said that throughout the 60-day development plan period, Korniak told him that a PIP was "imminent."  Bagby applied for a lateral transfer to a position in Akron, Ohio in March 2011, a position that was under Korniak's regional management.  Korniak refused Bagby's request and asked him to instead focus on his PDP goals.  Bagby also said he applied for a leadership training program and Korniak denied this, again telling him to focus on his PDP objectives.  (Bagby Dep. at 301)  Bagby said both of these events demonstrated Korniak's "hostility" and "retaliation" towards him.

On April 29, 2011, Bagby emailed Korniak to submit his resignation, with his last day to be May 13, 2011.  (Bagby Ex. GG)  Bagby did not discuss this decision with anyone at Covidien before submitting his notice.   On September 16, 2011, he filed a charge of discrimination with the EEOC.  (Bagby Ex. HH)  He alleged that he was forced to resign due to retaliation and harassment based upon his actual or perceived disability, and alleged discrimination and retaliation under the ADA.

Bagby subsequently filed a complaint against Covidien in Ohio state court, alleging six claims for relief.  (Doc. 4)  Covidien removed the case to this Court, and

moved to dismiss Counts 3 through 6.  This Court granted that motion (Doc. 9), leaving Bagby's Ohio law claim for disability discrimination (Count 1) and his claim that Covidien retaliated against him and interfered with his rights under the federal Family  and Medical Leave Act (Count 2).  Covidien now seeks summary judgment these  remaining claims.

## ANALYSIS

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992).  Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute.  Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita

Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court may grant judgment."  Anderson, 477 U.S. at 249-50 (citations omitted).

Disability Discrimination Claim

The familiar McDonnell-Douglas burden-shifting framework applies to analyze an Ohio claim of disability discrimination that is based on circumstantial evidence.  In order to establish a prima facie case under Ohio law, Bagby must demonstrate: (1) he was disabled, which is defined by Ohio Rev. Code 4112.01(a) as having a "physical or mental impairment that substantially limits one or more major life activities ... or being regarded as having a physical or mental impairment;" (2) he was subjected to an adverse employment action, or he was treated differently than similarly situated employees because of his alleged disability; and (3) he could substantially perform the essential functions of his job despite his alleged disability.  Hood v. Diamond Prods., 74 Ohio St.3d 298, syllabus ¶1 (Ohio 1996).  If he does so, the burden shifts to Covidien to articulate a legitimate, non-discriminatory reason for taking the adverse action, or for

-18-

treating Bagby differently than it treated similarly-situated comparators.  Bagby would then have to demonstrate that the reason was a pretext for disability discrimination.

Covidien contends that Bagby cannot satisfy the requirements of a prima facie claim.  Even if he could show that he was disabled or that Covidien regarded him as disabled (which Covidien argues he cannot do), Bagby has not shown that Covidien took an adverse action against him, or that it treated any similarly-situated employees differently than it treated Bagby.

The Sixth Circuit has noted that evidence establishing a disability "is the threshold requirement to claim discrimination under the ADA." Cassidy v. Detroit Edison Co., 138 F.3d 629, 633 (6th Cir. 1998).  An actionable adverse employment action is one that amounts to a materially adverse change in the terms and conditions of employment.  The denial of a lateral transfer is not an adverse employment action unless it results in a material change of salary, benefits, responsibilities, or prestige. See, e.g., Momah v. Dominguez, 239 Fed. Appx. 114, 123 (6th Cir. 2007); Moore v. City of Columbus, 129 Fed. Appx. 978, 981 (6th Cir. 2005). "[A] plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." Mitchell v. Vanderbilt Univ., 389 F.3d 177, 183 (6th Cir. 2004).  And placing an employee on an improvement plan or closely scrutinizing his work efforts is not an actionable adverse action. Novotny v. Reed Elsevier, 291 Fed. Appx. 698, 703 (6th Cir. 2008), citing Agnew v. BASF Corp., 286 F.3d 307, 310-311 (6th Cir. 2002).

Bagby claims that he was disabled, and that Korniak knew he was disabled or regarded him as disabled, by the spring of 2010 if not earlier.  Bagby cites his June 20,

2010 email to Korniak (written before his FMLA leave), where he mentions that he was "stressed enough on all fronts" and it was affecting his health and sleep.  This is not sufficient evidence of a disability as defined by Ohio law, much less evidence that Korniak regarded him as disabled.  As Covidien notes, Korniak told Hopkins on June 18 that he planned to put Bagby on a performance development plan because he was not reaching his sales targets.  The decision to do so was not in response to Bagby's expression to Korniak that he was feeling "stressed," or any perception that Bagby was disabled.  After his return from FMLA leave and the two-week accommodation period, Bagby was able to perform all of his job duties without assistance.  There is no evidence that at that time Bagby had an impairment that substantially limited any of his major life activities, much less any impairment that Covidien knew about.  Bagby was plainly unhappy working for Korniak; but the record fully supports the conclusion that his unhappiness grew out of the pocket-dialing incident, the loss of the California transfer, and Bagby's belief from the outset that Kelsey was a better manager than Korniak.

Regarding the second prong of the prima facie case, the incidents Bagby cites to establish an adverse employment action - the failure to approve his lateral transfer to Akron in 2011, putting him back on the  performance development plan, or transferring one of his hospitals to another sales agent while he was on leave - are insufficient. Bagby's compensation, title and benefits never changed.  He argues that the performance development plan was an adverse action because he believes that Korniak "set him up to fail."  He does not deny that he did not meet his sales targets for the first part of 2010, and he has no substantive evidence to support his allegation that Korniak "set him up" by imposing quotas or targets that were substantially different from

those expected of other sales employees.  Covidien has submitted evidence

documenting Bagby's performance sales statistics for FY 2010 as compared to his

regional teammates.  (Doc. 32, Ex. C, Koziol Declaration.)  Bagby complains that the

plan's sales goals were "unfair."  But his naked assertion of unfairness is insufficient to

establish a genuine dispute on this issue.

Moreover, Bagby was never placed on a Performance Improvement Plan, which

could lead to his termination.  Nor was Bagby terminated; he voluntarily resigned his

position by submitting his notice to Korniak.  He alleges that his resignation was a

constructive discharge.  To establish such a claim, Bagby must have evidence showing

that (1) Covidien deliberately created intolerable working conditions, as perceived by a

reasonable person, and (2) Covidien did so with intent to force Bagby to quit.  Logan v.

Denny's, Inc., 259 F.3d 558, 568-569 (6th Cir. 2001).  Bagby has not shown that the

terms and conditions of his employment were so objectively egregious or intolerable

that a reasonable person would be compelled to resign.  At best, he has shown that he

was unhappy under Korniak's management, and believed that Korniak was punishing

him for the pocket-dialing incident.  That is not enough to show that his working

conditions, in particular the terms of his performance development plan, were

**objectively** intolerable.  See, e.g., Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 887 (6th

Cir. 1996), affirming summary judgment in favor of the employer, where the court found

that plaintiff's "unsupported accusations of antagonistic, hostile conduct" by her

employer were insufficient to create a genuine factual dispute.

A similar situation was presented in Agnew v. BASF Corp., supra, where an

employee was placed on a performance improvement plan; two days later, he began a

-21-

leave of absence due to "emotional stress and breakdown." Agnew, 286 F.3d at 308.

While on leave, he applied for and was offered a job with another company.  He

nevertheless returned to his old job at BASF after his leave, and he was placed on the

performance improvement plan that he had not completed before his leave.  He

resigned the same day and later brought suit for age discrimination, alleging he was

constructively discharged because the terms of the plan were intolerable.  The Sixth

Circuit affirmed the summary judgment granted to BASF, because the terms of the plan

were not objectively intolerable.  This Court reaches the same conclusion here.

Bagby also asserts that Covidien denied him a reasonable accommodation for

his disability.  An employer must reasonably accommodate an employee's disability,

unless the employer can show that the accommodation would impose an undue

hardship on the operation of its business.  See, e.g., Smith v. Ameritech, 129 F.3d 857,

866 (6th Cir. 1997), quoting 42 U.S.C. § 12112(b)(5).  To support his failure to

accommodate claim, Bagby must show he has a disability, that he was otherwise

qualified for his job, and that Covidien refused his request for a reasonable

accommodation.  Covidien argues that Bagby was not disabled, and that it provided

Bagby the accommodation that his physician requested.

The Court has already concluded that Bagby was not disabled, as defined in the

Ohio statute.  Bagby testified that he was able to perform all of the essential functions of

his job after his two-week accommodation period, and he has not identified any other

impairment.  He refused Covidien's offer to extend that period, and Covidien extended

the date on which Bagby returned to his performance improvement plan.  Bagby argues

that Covidien denied him a reasonable accommodation when it refused to help him

"reintegrate" into his position, and that Covidien had an obligation to transfer Bagby to a new supervisor.  He cites Smith v. Midland Brake, 180 F.3d 1154 (10th Cir. 1999), where the court found that a reasonable accommodation can include reassigning an employee to a vacant position when the employee's disability renders him unable to perform his existing job.  In that case, the plaintiff became permanently disabled by chronic skin sensitivity and dermatitis caused by workplace exposure to various chemicals.  It was undisputed that  plaintiff could no longer perform his regular job, and his employer could not find another position within his department for which he was qualified.  Plaintiff had inquired several times about positions in other departments in the company, but the employer never told him about openings or vacant positions for which he may have qualified, and eventually terminated him.  The Tenth Circuit reversed the lower court's judgment in favor of the employer, finding a genuine factual dispute about whether or not plaintiff could have been reasonably accommodated in a vacant position in another department.

That case does not assist Bagby; Covidien had no obligation to transfer Bagby to a position that was not under Korniak's supervision (even if he had identified such a position that was vacant, which he did not do), or engage in the ADA's good-faith interactive process, if Bagby was not disabled.  He admits that he could perform all of the essential functions of his regular job, and he did not need further accommodations after the initial two-week period.  Bagby repeatedly accuses Korniak of causing his depression, anxiety and panic attacks, to argue that Covidien had a duty to accommodate him by changing his supervisor.  But there is no evidence to support that accusation other than Bagby's subjective assertion.  Covidien also cites his testimony

that at or near the time he asked for a leave of absence, he was experiencing other "life events," including ending a five year relationship and dealing with a sick parent.  And it is clear from Bagby's testimony that his difficulties with Korniak began almost as soon as Korniak became his manager.  He repeatedly attributed what he called Korniak's "hostile" conduct to the pocket-dialing incident that occurred in October-November 2009.

Even if Bagby could establish a prima facie case of disability discrimination (which the Court finds that he has not done), he has not shown that Covidien's stated reasons for taking the actions it took - that Bagby was not meeting his performance and sales goals - were pretextual.  Bagby could show pretext by coming forward with some evidence that Covidien's stated reason has no factual basis; or that it did not actually motivate the decision; or that the proffered reason was insufficient to motivate the decision.  See, e.g., Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).  Bagby argues that Covidien never gave him a reason for refusing to transfer him away from Korniak's supervision, which he suggests is itself sufficient evidence of pretext.  But Covidien had no duty to transfer him because he was unhappy or believed that Korniak was not the type of manager he wanted to work with.  He also argues that his performance development plans were a mere pretext for "forcing him" out due to his disability (or his exercise of FMLA rights).   Bagby asserts that other employees had performed worse than he did; but other than his own assertion, he has no evidence to rebut that presented by Covidien about his performance as compared to other sales agents in his territory.  He has not rebutted the basis for Korniak's decision to refuse his lateral transfer to Akron (which would have been under Korniak's

supervision) or to participate in a leadership program after he returned from leave: Korniak wanted him to focus on his PDP goals, and there is nothing suggesting that was not the real reason for Korniak's decision.

Bagby has not established a genuine factual dispute about his claim of disability discrimination, and Covidien is entitled to judgment on that claim.

FMLA Retaliation Claim

Bagby does not contest the dismissal of his claim that Covidien interfered with his FMLA rights. But he argues that he has established a genuine factual dispute as to whether Covidien retaliated against him for exercising his FMLA rights.

Employers are prohibited from retaliating against employees who take FMLA leave, and from using the exercise of FMLA leave rights as a negative factor in employment actions concerning those employees. Hunter v. Valley View Local Schools, 579 F.3d 688, 690-691 (6th Cir. 2009). To establish a prima facie case, Bagby must show that (1) he exercised his FMLA rights; (2) he suffered a materially adverse action; and (3) a causal connection exists between the two events. If he does so, the burden shifts to Covidien to demonstrate that its action was based on a legitimate, non-discriminatory reason or policy. Bagby must then come forward with evidence demonstrating that the reason was pretextual. See generally, Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 314 (6th Cir. 2001).

Bagby argues that the PDPs imposed on him were a materially adverse act that led directly to his constructive discharge. The Court has already concluded that the PDPs were not an adverse action for purposes of his disability claim. But even if the PDP could suffice for purposes of his prima facie retaliation case, Bagby relies almost

entirely upon the temporal proximity between his exercise of FMLA rights and his

alleged constructive discharge at the end of April, to establish a causal link.

The Sixth Circuit has recognized in some cases that temporal proximity alone

may be sufficient to establish the causal link for a prima facie retaliation claim.  See

Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523-26 (6th Cir. 2008):

> Where an adverse employment action occurs very close in
> time after an employer learns of a protected activity, such
> temporal proximity between the events is significant enough
> to constitute evidence of a causal connection for the
> purposes of satisfying a prima facie case of retaliation. But
> where some time elapses between when the employer
> learns of a protected activity and the subsequent adverse
> employment action, the employee must couple temporal
> proximity with other evidence of retaliatory conduct to
> establish causality.

And in Vereecke v. Huron Valley School Dist., 609 F.3d 392 (6th Cir. 2010), the court

emphasized the importance of a case-by-case analysis on this issue:

> In analyzing the facts in temporal proximity cases, we have
> always looked at the totality of the circumstances to
> determine whether an inference of retaliatory motive could
> be drawn.  At this point, our case law can fairly be
> characterized as recognizing the possibility that, on a
> particular set of facts, extremely close temporal proximity
> could permit an inference of retaliatory motive, but also
> recognizing that often evidence in addition to temporal
> proximity is required to permit the inference. ... Indeed, we
> have rarely found a retaliatory motive based only on
> temporal proximity.  Even in Mickey, where we articulated
> the principle that temporal proximity could hypothetically be
> sufficient in a given case, we noted the presence of
> additional evidence.

Id. at 400-401 (internal citations omitted).

Bagby contends that Covidien was "laying the groundwork" to "force" his

resignation as early as November 30, 2010, when Bagby emailed Hopkins about his

-26-

desire to return to a work environment that was free of Korniak's "hostility and retaliation."  He argues that Hopkins ignored his pleas, and he was forced to return to the same hostile situation.  He suggests this sequence of events is sufficient evidence of a causal link between his exercise of FMLA rights and Covidien's adverse actions.

The Court disagrees.  Hopkins' purported delay in responding to Bagby is irrelevant, especially as Bagby concedes that she did respond to him and informed him that he needed to request an accommodation.  Bagby has not explained why the "delay" suggests some causal link between his leave and his PDP.  And the subsequent delays in finalizing Dr. Dowling's requested accommodation were in large part due to the busy schedules of both Dowling and Dr. Amato, Covidien's physician.  Once they were able to discuss the situation, Hopkins informed Bagby promptly of the result.  When Bagby returned to work in February, he was placed on the PDP because he had not completed the plan in place when he began his leave.  That PDP was based on his performance, not on the exercise of his FMLA rights.  Bagby was not disciplined in the months after he went back to work.  Looking at the totality of the circumstances in this case, the Court concludes that the lag between Bagby's exercise of his FMLA rights and his resignation on April 29, or the timing of the series of events he cites, is too attenuated to support a reasonable inference of a causal connection.  Bagby has not pointed to other evidence that might suggest a causal link.  His own subjective belief that Covidien wanted him to quit because he exercised his FMLA rights is clearly not enough.

Even if Bagby could establish a prima facie retaliation claim, he has not shown that Covidien's explanations for putting him on the PDP (his unsatisfactory performance), or refusing his request to transfer to Akron and to participate in the

leadership program (so that he could concentrate on his PDP) were a pretext for retaliation.  As discussed above, the PDP pre-dated his FMLA leave.  And Bagby has no evidence that Korniak's directions to focus on his PDP goals did not actually motivate Korniak's decisions, or were insufficient to motivate them.

The Court concludes that Covidien is entitled to entry of judgment on Bagby's FMLA retaliation claim.

## CONCLUSION

For all of the foregoing reasons, Defendant's motion for summary judgment (Doc. 24) is GRANTED.  Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: March 17, 2014                    s/Sandra S. Beckwith
                                               Sandra S. Beckwith, Senior Judge
                                               United States District Court